No. 22-13073-JJ

## IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

TYLER M. COPELAND,

*Plaintiff-Appellant*,

v.

GEORGIA DEPARTMENT OF CORRECTIONS,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Southern District of Georgia
No. CV 620-057 (J. Randall Hall, C.J.)

## BRIEF OF APPELLANT

Kenneth E. Barton III
Georgia Bar No. 301171

COOPER, BARTON, & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com
*Counsel for Plaintiff-Appellant*

Docket No. 22-13073-JJ
*Copeland v. Georgia Department of Corrections*

## CERTIFICATE OF INTERESTED PERSONS

COMES NOW Plaintiff-Appellant Tyler M. Copeland, by and through the undersigned counsel, and pursuant to Federal Rule of Appellate Procedure 26.1 and Rule 26.1 of this Court, hereby states that the following individuals and entities have an interest in the outcome of this case and/or appeal:

Barton III, Kenneth E.

Brown, Readdick, Bumgartner, Carter, Strickland & Watkins, LLP

Carr, Honorable Chris Carr

Carter, G. Todd

Cooper, Barton & Cooper, LLP

Cooper, Ashley A.

Cooper, M. Devlin

Copeland, Tyler M.

Georgia Department of Law

Hall, Honorable J. Randall

State of Georgia

Plaintiff-Appellant Tyler M. Copeland further states that, he is not aware of any information or parties required to be disclosed pursuant to Federal Rule of Appellate Procedure 26.1.

## STATEMENT REGARDING ORAL ARGUMENT

The dispositive issues in this case have been authoritatively decided by this Court and that of the United States Supreme Court concerning both the substance of the claims and the legal standards on summary judgment. Based on the record evidence, it is clear that the Plaintiff-Appellant met his burden on summary judgment, and as a result, the decisional process would not be significantly aided by oral argument.

As a result Plaintiff-Appellant Tyler M. Copeland respectfully submits that oral argument need not be permitted. In the event that the Court does issue notice for such oral argument, Plaintiff-Appellant will participate willingly to aid the Court's adjudication of this matter.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ........................................... i

TABLE OF CONTENTS ................................................................................. ii

TABLE OF AUTHORITIES ........................................................................... iii

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION
................................................................................................................... vi

STATEMENT OF THE ISSUES .......................................................................1

STATEMENT OF THE CASE ...........................................................................2

   A.   Factual Background ...............................................................................2

   B.   Procedural Background.......................................................................14

   C.   Standard of Review ...........................................................................15

SUMMARY OF THE ARGUMENT ................................................................16

ARGUMENT ..................................................................................................17

   A.   Copeland's Evidence Would Permit a Reasonable Jury to Find that He
was the Victim of a Hostile Work Environment...............................17

     1)   There is no dispute that Copeland was subjected to unwelcomed
harassment based on a protected trait. ..............................................18

     2)   The harassment of Copeland was so pervasive that it altered the terms,
conditions, and privileges of Copeland's employment. ....................19

     3)   Defendant is liable for the hostile work environment because supervisors
were responsible for some of the conduct and Defendant failed to adequately
address Copeland's complaints. ........................................................29

   B.   It Was Erroneous to Grant Summary Judgment Without Considering
all the Alleged Acts of Retaliation, and Copeland Met His Burden on his
Failure to Promote Claims. ...............................................................31

   C.   Copeland Should Have Been Permitted to a Trial by Jury, Both in Light
of the Applicable Standard and the Seventh Amendment...............37

CONCLUSION................................................................................................42

CERTIFICATE OF COMPLIANCE ....................................................................

CERTIFICATE OF SERVICE .............................................................................

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970)....................................................42

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...................................... 15, 41

*B&G Enters. v. United States*, 220 F.3d 1318 (11th Cir. 2000) ..............................15

*Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001 (4th Cir. 1987) ................................................................................................................................39

*Barreth v. Reyes 1, Inc.*, No. 15:19-cv-00320-TES, 2020 WL 4370137 (M.D. Ga. July 29, 2020)...............................................................................................................26

*Batey v. Stone*, 24 F.3d 1330 (11th Cir. 1994)...........................................................39

*Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731 (2020) ...........................................18

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) ...........................................30

*Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ............ 32, 33, 37

*Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209 (11th Cir. 2008) ............................32

*Chapman v. AI Transp.*, 229 F.3d 1012 (11th Cir. 2000).........................................39

*Cid v. City of Miramar*, 810 F. App'x 816 (11th Cir. 2020) ...................... 34, 35, 36

*Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) .........................................20

*Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417 (11th Cir. 1999) ........25

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)............................... 19, 25, 30

*Guthrie v. Waffle House, Inc.*, 460 F. App'x 803 (11th Cir. 2012)........................24

*Harris v. Forklift Sys., Inc.*, 5100 U.S. 17 (1993) ...................................................20

*Hinson v. Clinch Cnty. Bd. of Educ.*, 231 F.3d 821 (2000) .............................. 16, 26

*Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62 (2d Cir. 2001)..................................39

*Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012) ...................... 15, 16

*Luciano v. Montfort, Inc.*, 259 F.3d 906 (8th Cir. 2001)........................................39

*Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999).................. 18, 19, 20, 30

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986) .........................................19

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269 (11th Cir. 2002) ....... 17, 25, 32

*Monaghan v. Worldpay US, Inc.*, 955 F.3d 855 (11th Cir. 2020) ................... 32, 33

*Montesano v. Westgate Nursing Home, Inc*., 956 F. Supp. 2d 417 (W.D.N.Y. 2013) ......................................................................................................39

*Morrison v. Amway Corp.*, 323 F.3d 920 (11th Cir. 2003) ....................................16

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).......................... 20, 25

*O'Shea v. Yellow Technology Services, Inc*., 185 F.3d 1093 (10th Cir. 1999) .......39

*Ortiz v. Werner Enters., Inc*., 834 F.3d 760 (7th Cir. 2016)...................................40

*Parklane Hosier Co., Inc. v. Shore*, 439 U.S. 322 (1979) ......................................37

*Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464 (1962)...................................42

*Reeves v. C.H. Robinson Worldwide, Inc,* 594 F.3d 798 (11th Cir. 2010)...... 20, 25

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) .................. 16, 19

*Roberts v. Clark Cnty. Sch. Dist.*, 215 F. Supp. 3d 1001 (D. Nev. 2016) ..............28

*Straughn v. Delta Air Lines, Inc*., 250 F.3d 23 (1st Cir. 2001) ..............................39

*Tolan v. Cotton*, 572 U.S. 650 (2014)........................................................... 15, 21

*Vance v. Ball State Univ.*, 570 U.S. 421 (2013) ....................................................30

*Von Drasek v. Burwell*, 121 F. Supp. 3d 143 (D.D.C. 2015) .................................39

*Waltman v. Int'l Paper Co*., 875 F.2d 468 (5th Cir. 1989).....................................39

*Webb v. Clyde L. Choate Mental Health and Dev. Ctr.*, 230 F.3d 991 (7th Cir. 2000) ......................................................................................................39

*Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226 (11th Cir. 2011)..... 32, 34, 36, 37

**Statutes**

28 U.S.C. § 1291 .....................................................................................................6

28 U.S.C. § 1343 .....................................................................................................6

28 U.S.C. § 1367 .....................................................................................................6

28 U.S.C. § 2106 .....................................................................................................6

28 U.S.C. § 2107 .....................................................................................................6

42 U.S.C. § 2000e-2................................................................................................17

42 U.S.C. § 2000e-3................................................................................................32

**Other Authorities**

Ann McGinley, *Cognitive Illiberalism, Summary Judgment, and Title VII: An Examination of Ricci v. Destefano*, 57 N.Y.L. Sch. L. Rev. 865, 868 (2013) .....38

Brandon L. Boxer, *Judicial Gatekeeping and the Seventh Amendment: How Daubert Infringes on the Constitutional Right to A Civil Jury Trial*, 14 Rich. J.L. & Pub. Int. 479, 481 (2011) ............................................................................38

EEOC Guidance 405:7652 ....................................................................30

Eisenberg & Lanvers, *Summ. J. Rates Over Time, Across Case Categories, and Across Districts* (May 28, 2008) (finding this Circuit's rate almost doubled from 1980-81 to 2001-02 with 25% dismissal rate compared to 7.8% nationwide average), available at: https://ssrn.com/abstract=1138373 (last visited Dec. 7, 2022) ....................................................................................................41

FJC Memorandum at 9-10 (revised June 15, 2007) (finding this Circuit had 75% dismissal rate and the highest district in the Eleventh Circuit dismissed 95% of the cases, the highest percentage in the country), available at: https://www.fjc.gov/sites/default/files/2012/sujufy06.pdf (last visited Dec. 7, 2022) ....................................................................................................41

*Jameson v. U.S. Postal Serv.*, EEOC Dec. No. 0120130992, 2013 WL 2368729 (2013) ................................................................................................27

Kevin M. Clermont & Stewart J. Schwab, *Employment Discrimination Plaintiffs in Federal Court: From Bad to Worse?*, 3 Harv. L. & Pol'y Rev. 103, 127 (2009)38

*Lusardi v. McHugh*, EEOC Dec. No. 0120133395, 2015 WL 1607756 (2015)27, 28

Sandra F. Sperino and Suja A. Thomas, *Unequal: How America's Courts Undermine Discrimination Law*, Chapter 4 (2017) ..................................................40

The Declaration of Independence para. 2 (U.S. 1776) ...........................................38

*The Unconstitutional Application of Summary Judgment in Factually Intensive Inquiries*, 12 U. PA. J. CONST. L. 195 (2009) .....................................................40

**Regulations**

29 C.F.R. § 1604.11 ..............................................................................30

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The district court had original jurisdiction over Plaintiff-Appellant Tyler M. Copeland's (hereinafter, "Copeland") claims pursuant to Title VII of the Civil Rights Act of 1964 (hereinafter, "Title VII") and the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. Upon the district court's disposition of all claims, this Court's appellate jurisdiction is derived from 28 U.S.C. §§ 1291, 2106 & 2107.

On August 22, 2022, the district court entered its Order disposing of all claims, and the Clerk of Court entered Judgment on the same day. Copeland timely filed his Notice of Appeal on September 12, 2022.

## STATEMENT OF THE ISSUES

When Tyler Copeland attempted to have his personnel file updated to reflect his legal name change, his employer told pretty much all of his co-workers that he is transgender.  Nearly every day after that point, for a period of around at least fifteen months, numerous colleagues and supervisors refused to respect that he identifies as male, openly discussed his genitalia, referred to him as female on the facility-wide radio, with one supervisor routinely calling him "baby girl," called his very existence an "abomination," and even subjected him to threats of violence and actual physical assaults.

Whether a reasonable juror could have found that Copeland's employer subjected him to a hostile work environment based on his sex?

Whether Copeland satisfied the "easily satisfied" burden on summary judgment of showing a causal connection between several tangible employment actions and the complaints he made to his employer and the EEOC?

## STATEMENT OF THE CASE

### A. Factual Background

At all relevant times, Copeland was a correctional officer holding rank of "Sergeant," and later "Lieutenant," employed with Defendant-Appellee Georgia Department of Corrections (hereinafter, "Defendant") at its correctional facility, Rogers State Prison, in Reidsville, Georgia. (Doc. 1, ¶ 4; SOF, ¶ 1.) [1]

Lt. Copeland was assigned female at birth, but he identifies and presents as male, and as a result, also identifies as transgender. (Doc. 1, ¶ 10; SOF, ¶¶ 2.) In 2017, Lt. Copeland began his medical transition, and he completed the process of legally changing his name in August 2018. (*Id.*, ¶¶ 11-12; SOF, ¶¶ 3-4.) In September 2018, Lt. Copeland "came out," or voluntarily disclosed his gender identity to some third-parties and living openly concerning the expression of his gender, at work and with his coworkers. (*Id.*, ¶ 13; *see also* SOF, ¶ 5; Doc. 46-3 at 113.) Around the same time, Lt. Copeland notified Defendant's Human Resources Department of his legal name change, but Defendant refused to make these changes to Lt. Copeland's personnel file reflecting this change until after he first met with Defendant's HR Director Betsy Thomas (hereinafter, "HR Director Thomas"). (*Id.*,

---

[1] As referenced herein, "SOF" is intended to refer to the individually numbered paragraphs of Defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment (Doc. 46-1) and Copeland's Superseding Response to Defendant's Statement of Undisputed Material Facts (Doc. 58-1).

¶ 14; SOF, ¶ 5; Doc. 46-3 at 113.) Lt. Copeland complied with Defendant's demand and met with HR Director Thomas by phone on September 10, 2018. (*Id.*, ¶ 15; SOF, ¶ 5; Doc. 46-3 at 113.) Lt. Copeland began to question whether this was actually "standard procedure," as he had been reassured, when HR Director Thomas asked Lt. Copeland if had yet had "the surgery," and then Lt. Copeland overheard other employees laughing in the background. (Doc. 46-3 at 113.) Lt. Copeland told HR Director Thomas that he did not believe that any surgeries he may have had were anyone else's business. (*Id.*) However, even after this telephone meeting occurred, Defendant still refused to make changes to Lt. Copeland's personnel file until several months later. (*Id.*, ¶ 16; SOF, ¶ 5.)

When HR Director Thomas met with Lt. Copeland and his coworkers, including his subordinates, in late September 2018, HR Director Thomas advised the employees to address Lt. Copeland simply with male pronouns and his rank, which at the time was "Sergeant." (*Id.*, ¶ 17; SOF, ¶ 5; Doc. 46-3 at 113.) However, it was apparent that Defendant's employees, which included the entire shift that Lt. Copeland was assigned to oversee, did not take the directives seriously, and several employees made inappropriate or offensive comments during that meeting that went unaddressed by HR Director Thomas. (SOF, ¶ 5; Doc. 46-3 at 83:12-85:25.) One of the topics of conversation that arose during this meeting was Lt. Copeland's use of the restroom. (Doc. 46-3 at 113; SOF, ¶ 5.) At the least, Defendant implied that Lt.

Copeland should not use restrooms designated for males, despite the fact that Lt. Copeland had no desire, and was not comfortable, using the restroom marked as female. (*Id.*) The only restrooms in Defendant's facility that are designated for one gender or another are those used mostly by visitors to the prison and administrative staff, and the remaining bathrooms do not have any gender designation. (*Id.*) During the meeting, another employee, Officer Barnes, asked "if Sgt. Copeland hasn't had 'the surgery' yet, how can Sgt. Copeland strip search (male) offenders?" (SOF, ¶ 5; Doc. 46-3 at 113.) HR Director Thomas and another supervisor responded to this inquiry by saying they would have to get clarification from their legal department. (*Id.*) After the meeting with HR Director Thomas, one of Lt. Copeland's female coworkers told him explicitly that she refused to refer to Lt. Copeland by male pronouns because it was not in line with her personal beliefs. (SOF, ¶ 5.)

The most serious and frequent harassment of Lt. Copeland began soon after this meeting with HR Director Thomas. (Doc. 1, ¶ 18.) After this meeting, the same coworkers who had previously referred to Lt. Copeland as "sir" began calling him "ma'am" on a regular, routine, and daily basis. (*Id.*, ¶ 19; SOF, ¶ 8.) Several coworkers went out of their way to intentionally reference Lt. Copeland as female around new employees. (*Id.*, ¶ 20.)

Coworkers also began misgendering Lt. Copeland by referring to him as female over the prison-wide two-way radio channel, and in response, other

individuals would press the push-to-talk button to intentionally transmit their laughter. (*Id.*, ¶ 21; SOF, ¶ 8.)  Since supervisors were always referenced on the radio using a call sign, such as Lt. Copeland's "L1B," these coworkers had no legitimate reason to make such comments. (Doc. 46-3 at 37:25-38:23; SOF, ¶ 8.) Even worse, some of Lt. Copeland's coworkers would call Lt. Copeland "that" or "it," which Lt. Copeland found extremely insulting and dehumanizing. (*Id.* at 113; SOF, ¶ 8.)

Frequently, Lt. Copeland became aware of coworkers discussing his personal information, and spreading rumors and gossip, outside of his presence. (Doc. 1, ¶ 22.) These conversations included discussions pertaining to Lt. Copeland's genitalia. (*Id.*, ¶ 23.) On one occasion, a coworker was discussing Lt. Copeland and the coworker stated, "she must have a dildo in her pants." (*Id.*, ¶ 24; Doc. 53-2 at 3.) Beyond making Lt. Copeland uncomfortable in the workplace, he was concerned that these kinds of remarks would cause him to be subjected to increased security screenings when entering the facility, including invasive strip searches. (*Id.*, ¶ 25; Doc. 53-2 at 3-4.)   Critically, Lt. Copeland's coworkers had some of the conversations in the presence of inmates. (*See, e.g.*, Doc. 46-3 at 94:7-17.) In addition to the conduct from Lt. Copeland's coworkers, including employees whom he was assigned to supervise, Lt. Copeland's supervisors were responsible for additional harassment. (Doc. 1, ¶ 26.)

In all, Lt. Copeland felt like the constant misgendering, disclosure of his personal information to other employees and offenders in their custody, comments about his genitalia, and being referred to by the dehumanizing terms of "it" and "that" were not only creating hostile and abusive conditions in the workplace, but was also undermining his authority and preventing him from being an effective supervisor and leader. (Doc. 46-3 at 113.)

In February 2019, Lt. Copeland was assigned to a new supervisor, and after describing the harassment that he had experienced over the last several months, the new supervisor gave Lt. Copeland the opportunity to address the employees on his shift. (Doc. 1, ¶ 27; Doc. 46-3 at 114.) Lt. Copeland explained to the employees that there was zero tolerance for harassment, but that if they had personal or religious objections to using male pronouns for him, they could simply refer to Lt. Copeland by his rank and last name. (Doc. 46-3 at 114.) A little over a week later, another supervisor approached Lt. Copeland, told Lt. Copeland that he had been wrong for addressing his shift about the issues he was experiencing, and said that he could be disciplined for interfering with others' religious beliefs. (*Id.*) Lt. Copeland reported this exchange, as well as a subordinate employee who started using female pronouns that very same day, to his supervisors, but there were no substantive actions taken. (*Id.*) Lt. Copeland was merely told that he needed to give people more time to adjust. (*Id.*)

6

Indeed, Lt. Copeland did not document any incidents that occurred between February 2019 and May 2019, but that was only because Lt. Copeland was on medical leave and not at work. (S*ee* Doc. 46-3 at 114.)

By June 2019, only a week after he returned from medical leave, Lt. Copeland contacted a representative with Human Resources to follow up concerning the harassment that he previously reported, as well as what he continued to experience when he returned, and Lt. Copeland was assured that the Warden would be advised. (Doc. 1, ¶ 30; Doc. 46-3 at 114.)  On June 6, 2019, Lt. Copeland also contacted Defendant's Employee Assistance Program ("EAP") in the hopes that he would finally be able to get help from one of the program's therapists or mediators in resolving his workplace challenged, but Lt. Copeland initially did not hear back from EAP. (Doc. 46-3 at 114.)

In mid-June 2019, Lt. Copeland was referred to once again as female on the radio, and when Lt. Copeland realized it was the facility's supervisor over recruitment who made the comment, Lt. Copeland approached him and asked him respectfully not to embarrass him like that again.  (Doc. 46-3 at 114.)  Not only did Lt. Copeland hear his colleagues laughing when he was referred to as female on the radio, the recruiting supervisor also made a comment to another employee and then laughed obnoxiously as Lt. Copeland was leaving this conversation. (*Id.*)

On June 18, 2019, Lt. Copeland spoke to a representative of HR concerning

harassment that he was experiencing from several people. (Doc. 46-3 at 115.) The HR representative said that she would speak with the Warden of the facility, and Lt. Copeland was told to wait to meet with the Warden at the end of his shift. (*Id.*) While Lt. Copeland waited in the lobby to meet with the Warden, another supervisor approached him to advise Lt. Copeland that he was being moved to the night shift three days later. (*Id;* Doc. 1, ¶¶ 30-31.) No reason was provided for the reassignment. (*Id.*)

Soon after Lt. Copeland began on the less-desirable night shift, one supervisor began calling him names such as "baby girl" on a routine basis, which the same individual had never said before Lt. Copeland came out as transgender. (Doc. 1, ¶ 28; Doc. 46-3 at 93:8-19; Doc. 46-3 at 115.) Additionally, supervisors began interfering and refusing to allow Lt. Copeland to take approved time off that he needed to take for his medical needs, including those for transgender-related medical care. (Doc. 1, ¶¶ 33-35; Doc. 46-3 at 115.) Several days into the new night shift assignment, Lt. Copeland advised his captain that he had scheduled a doctor's appointment several months earlier that upcoming Friday, and he asked to be able to leave early in order to travel to the appointment. (Doc. 46-3 at 115.) The captain approved Lt. Copeland's early departure, but when the time came for him to leave, another supervisor refused to release him. (*Id.*) The following month, Lt. Copeland got approval to be out for two additional days for medical appointments, but when

Lt. Copeland missed work, he got written up by another supervisor. (*Id.* at 115-16.) Lt. Copeland was aware of other employees who were permitted to leave or miss work for such appointments, even when they give late notice, and they were neither disciplined or asked detailed questions about the purposes of such treatment. (*Id.* at 115.)

At the same time, Lt. Copeland continued to be misgendered and have his coworkers make "jokes" concerning his gender identity. (Doc. 1, ¶ 36; *see also* Doc. 46-3 at 115-19.)  Lt. Copeland continued to report the harassment to supervisors; some of his supervisors were either responsible for or observed the conduct, although Defendant completely and entirely failed to address the conduct at issue. (Doc. 1, ¶¶ 37-40.)  That is, despite the "statewide sexual harassment policy" touted by Defendant (*see, e.g.*, Doc. 46-1 at 6), that it clearly failed to follow. (*See* Doc. 46-4.)[2]

By August 2019, Lt. Copeland became subject to physical threats and assaults in the workplace in which it was clear that his gender identity, and his coworkers' apparent objection thereto, was the motivating factor. (*Id.*, ¶¶ 42-48.)  On August 23, 2019, as Lt. Copeland was attempting to enter the front door of the facility, a female correctional officer, Officer Holland, blocked the entryway, preventing Lt.

---

[2] As the district court discussed (Doc. 63 at 2-3), the policy offered by Defendant was effective as of March 1, 2019, well after the harassment of Lt. Copeland had commenced.

Copeland from going into the building. (Doc. 46-3 at 118.) Officer Holland, one of Lt. Copeland's subordinates, then said, "you know we can fight." (*Id.*) Officer Holland then told Lt. Copeland that, when people called him "ma'am" and Lt. Copeland objects, that offends Officer Holland because she is "proud to be a woman." (*Id.*; Doc. 1, ¶ 45.) Previously, on three or four occasions, Officer Holland had told Lt. Copeland that it was an "abomination" to be homosexual and to live his "lifestyle." (Doc. 46-5 at 25.) Officer Holland also told Lt. Copeland that this was what the Bible said, and on one occasion, she played loud gospel music just as Lt. Copeland was arriving to his post. (*Id.*)

While both individuals went their separate ways, the conflict arose once again three days later. (Doc. 46-3 at 118.) On August 26, 2019, Officer Holland pushed Lt. Copeland as he walked past Officer Holland on his way to a break. (*Id.*) Lt. Copeland left to sit in his personal vehicle during his break, and he soon observed an armed Officer Holland circling the parking lot, apparently looking for Lt. Copeland. (*Id.*) When Officer Holland found Lt. Copeland in his vehicle, she circled it several times, and peered occasionally into the car directly at Lt. Copeland. (*Id.*) Not only was Lt. Copeland concerned about what Officer Holland would do next, he was concerned for his life since she was carrying a firearm. (*Id.*)

Lt. Copeland immediately sent an email to his captain, the Deputy Warden of Security, and the Warden about his encounter with Officer Holland while he was

10

still sitting in his vehicle on break. (*Id.*) In addition to advising his supervisors of the situation, both the August 23, 2019 and August 26, 2019 incidents had been observed by two of Lt. Copeland's fellow sergeants. (*Id.*; SOF, ¶ 9.) However, after he reported these events, Defendant failed to take any disciplinary or corrective action against the corrections officer. (*Id.*, ¶ 48.) Additionally, at the end of August 2019, another subordinate who was friendly with Officer Holland walked up behind Lt. Copeland while he was speaking to another employee, and this friend of Officer Holland slapped Lt. Copeland firmly on his shoulder. (Doc. 46-3 at 118.)

While Defendant purports that it conducted an investigation through internal affairs, the investigator herself made inappropriate, and clearly intentional, comments about Lt. Copeland's gender identity during the interview. (*Id.*, ¶¶ 49-50.) When Lt. Copeland complained about this conduct during the investigation, Defendant claimed that the recording of the interview had been corrupted and was no longer accessible. (*Id.*, ¶ 51.) During the investigation, one of Lt. Copeland's fellow sergeants confirmed that she saw Officer Holland push Lt. Copeland from behind, and it was also corroborated by security footage, but Officer Holland admitted to pushing Lt. Copeland, claiming it was a joke. (Doc. 46-5 at 32, 40-41, 55.) Even though Lt. Copeland clearly objected to this treatment, and Officer Holland admitted in an interview that she pushed him, Defendant did not take any disciplinary actions against Officer Holland. (SOF, ¶ 9; Doc. 46-3 at 91:2-10.)

11

From the time that Lt. Copeland's gender identity became known at work in Fall 2018, until after he filed a Charge of Discrimination with the Equal Employment Opportunity Commission, Lt. Copeland sought numerous opportunities for promotion, but, despite his qualifications, Defendant failed to promote him due to his gender identity. (*Id.*, ¶ 52.) Lt. Copeland even tried to seek a lateral transfer to another facility to avoid the harassment, but Defendant also denied this request. (*Id.*, ¶ 53.) [3]

Lt. Copeland initially attempted to document all of the most notable incidents of harassment and discrimination that he suffered on the job. (Doc. 46-3 at 44:8-48:23; Doc. 46-3 at 113-19.) Lt. Copeland documented these incidents that occurred daily to roughly every few days. (*Id.*) However, by September 4, 2019, after Defendant failed to properly investigate Lt. Copeland's complaint about being assaulted by a coworker, and then found that the complaint was purportedly without merit, Lt. Copeland stopped documenting the harassment he experienced. (Doc. 46-3 at 48:2-23; *see also* Doc. 46-3 at 119.) Indeed, Lt. Copeland lost all faith in Defendant's internal affairs department and Defendant's wiliness or ability to address his concerns. (*Id.*)

On September 30, 2019, Lt. Copeland filed a Charge of Discrimination with

---

[3] In discovery, Defendant refused to say whether Officer Holland was disciplined because of this incident. (Doc. 53-4 at 7.)

the Equal Employment Opportunity Commission, alleging ongoing harassment and hostile work environment, as well as other disparate treatment, all because of his sex and gender identity. (Doc. 1, ¶ 61; Doc. 53-2 at 1-5.)

In February 2020, around seventeen months after Lt. Copeland requested that Defendant update its records to reflect his legal name change, an incident occurred in which Defendant's intention not to respect the name change remained apparent. Specifically, there is a board in one of the captain's offices, in which a "locator card" for each employee working on that shift is placed. (*See* Doc. 46-3 at 10:16; Doc. 58-2 at 1-4.) Even though Defendant had issued a new locator card in which Lt. Copeland's name had been updated, one of Defendant's employees found Lt. Copeland's old locator card referring to "Cassandra Leigh Copeland" and placed it on the captain's board. (*Id.*) Like Lt. Copeland's other complaints, Defendant failed to address this incident. (*Id.*)

In late 2019, Defendant finally assigned Lt. Copeland to a counselor with the EAP program. (Doc. 1, ¶ 55.) After speaking with Lt. Copeland, the EAP counselor asked Defendant for a meeting Lt. Copeland's supervisors; however, when they arrived, they found that the individuals whom Lt. Copeland had identified as being most-responsible for the harassment were present. (*Id.*, ¶ 56-57.) During the meeting, the EAP counselor also observed these employees constantly referring to Lt. Copeland as "she" and "ma'am," and she also noticed that Defendant had posted

13

Lt. Copeland's old locator card, as discussed above, on the wall alongside of the other supervisors' cards. (*Id.,* ¶ 58.)

Lt. Copeland was constantly subjected to a hostile work environment ever since Defendant's Human Resources Director forced Lt. Copeland to participate in the meeting with nearly all of his coworkers in September 2018 in which his gender identity was disclosed to all. Additionally, it was not until the individual in charge of promotions to lieutenant was removed that Lt. Copeland finally received the promotion for which he was qualified. (*Id.*, ¶ 59.) This had been the same recruitment lieutenant who referred to Lt. Copeland on the radio using female pronouns in June 2019. Moreover, Defendant only promoted Lt. Copeland a few days after the EEOC dismissed his Charge of Discrimination on March 30, 2020, and before Lt. Copeland filed his judicial complaint. (*Id.*, ¶ 61, Doc. 46-3 at 26:18-27:11.)

## B. Procedural Background

On September 30, 2019, Lt. Copeland submitted his Charge of Discrimination to the Equal Employment Opportunity Commission. (Doc. 1, ¶ 61; Doc. 53-2.) While Defendant submitted a written position statement to the EEOC in response to the Charge on or about January 31, 2020, the EEOC failed to provide Lt. Copeland with a copy, and then issued a Dismissal and Notice of Rights when he did not respond. (*Id.*, ¶¶ 62-63.) Lt. Copeland received the Dismissal and Notice of Rights on March 18, 2020. (*Id.*, ¶ 64.) Lt. Copeland initiated the instant action on June 9,

2020 in the United States District Court for the Southern District of Georgia (herein, "district court"). (Doc. 1.)

On December 13, 2021, Defendant filed its Motion for Summary Judgment, which sought for this matter be disposed of in its entirety. (Doc. 46.) Lt. Copeland filed his brief in response. (Doc. 53; Doc. 58.)[4] On August 22, 2022, the district court entered its Order, granting Defendant's Motion in its entirety. (Doc. 63.) Judgment was entered on the same day (Doc. 64), and Lt. Copeland timely filed his Notice of Appeal on September 12, 2022. (Doc. 66.)

### C. Standard of Review

The Court reviews a grant of summary judgment *de novo*. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1291 (11th Cir. 2012); *B&G Enters. v. United States*, 220 F.3d 1318, 1322 (11th Cir. 2000). In ruling on a motion for summary judgment, "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The court does "not weigh evidence or make credibility determinations" or decide disputed facts.

---

[4] Lt. Copeland sought an extension of time prior to his deadline to file his brief. (Doc. 52.) The district court granted Lt. Copeland's request (Doc. 54), but it was after Lt. Copeland had already filed his initial response. As a result, the district court allowed Lt. Copeland to file a superseding brief in opposition to the Motion for Summary Judgment. (Doc. 54.) The superseding brief was filed on March 4, 2022. (Doc. 58.) Defendant did not file a brief in reply.

*Jones*, 683 F.3d at 1292. "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'" *Hinson v. Clinch Cnty. Bd. of Educ.*, 231 F.3d 821, 827 (2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)). "In other words, [the court] must consider the entire record, 'but disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Id.* Ultimately, if a "reasonable juror could find for the non-moving party," summary judgment must be denied. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003).

## <u>SUMMARY OF THE ARGUMENT</u>

The district court erred in granting summary judgment to Defendant on Copeland's claims for hostile work environment.  There was no dispute that Copeland belongs to a protected group, that he was subjected to unwelcomed harassment, and that the harassment was based on his protected trait.  A reasonable juror could have found that this harassment was sufficiently severe and pervasive to alter the terms and conditions of Copeland employment, and that he was subjected to an abusive working environment.  As a result, the district court erred in granting summary judgment in favor of Defendant, disposing of Copeland's harassment claim.

The district court failed to take into account all of the conduct that Copeland claimed was retaliatory. With regard to Defendant's refusal to promote Copeland after he complained internally to Defendant and to the EEOC about the treatment, Copeland satisfied the "easily satisfied" standard concerning retaliation, and the district court erred in dismissing these claims as a result.

Moreover, Copeland was not afforded the opportunity to have both the evidence and reasonable inferences viewed in his favor, which was inconsistent with both the legal standards on summary judgment and Copeland's Seventh Amendment right to a trial by jury. As a result of these errors, the district court's decision should be reversed, and this matter remanded for a jury trial on the merits.

## **ARGUMENT**

### A.    Copeland's Evidence Would Permit a Reasonable Jury to Find that He was the Victim of a Hostile Work Environment.

A reasonable juror could find that Copeland's evidence was sufficient to sustain his claim for harassment and a hostile work environment, making summary judgment inappropriate. Title VII "prohibits employers from discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting 42 U.S.C. § 2000e-2(a)(1)). When an employer takes such action against an employee for being gay or transgender, "it necessarily and intentionally

discriminates against that individual in part because of sex." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1744 (2020).

A plaintiff seeking to establish a harassment or hostile work environment claim must show: 1) he belongs to a protected group; 2) he was subjected to unwelcomed harassment; 3) the harassment was based on a protected characteristic; 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment; and, 5) the employer is responsible for such environment under a theory of vicarious or direct liability. *Miller*, 277 F.3d at 1275 (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).

Copeland presented evidence in support of all five factors for which a reasonable juror could have found in his favor. As a result, summary judgment should have been denied on Copeland's hostile work environment claim.

1) <u>There is no dispute that Copeland was subjected to unwelcomed harassment based on a protected trait.</u>

As the district court recognized, Copeland met the first three elements of his hostile work environment claim. (*See* Doc. 63 at 10.)  As a male who identifies as transgender, Copeland belongs to a protected group. (*Id.*; Doc. 58-1, ¶¶ 2-4.) Additionally, Defendant did not argue that Copeland failed to show he was subjected to unwelcomed harassment, or that this harassment was based on the protected trait at issue. (Doc. 63 at 10; Doc. 46-1 at 3; Doc. 58-1, ¶¶ 8-9.)  As a result, Copeland

established the first three of the aforementioned elements of his hostile work environment claim.

    2) <u>The harassment of Copeland was so pervasive that it altered the terms, conditions, and privileges of Copeland's employment.</u>

However, the district court should have found that Copeland offered evidence showing that the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment and created a discriminatory abusive working environment. That is especially true if such evidence had been viewed in the light most favorable to Copeland with factual disputes being resolved in this favor. *See Reeves*, 530 U.S. at 150. Had the harassment merely consisted of Copeland being referred by colleagues as "ma'am" or "she" and being confronted by a co-worker who said she was proud to be female, as Defendant argued (*see* Doc. 46-1 at 3-5), the district court's conclusion *may* have been correct. However, that analysis ignores the vast majority of evidence that Copeland presented to the Court.

Of course, not all workplace conduct called harassment affects a term, condition, or privilege of employment, and "simple teasing, offhand comments, and isolated incidents," unless extremely serious, may not sustain such a claim. *See Mendoza*, 195 F.3d at 1245 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)). Whether harassment "was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and objective component." *Id.* at

1246 (citing *Harris v. Forklift Sys., Inc.*, 5100 U.S. 17, 21-22 (1993)).  As a result, the employee must have had an objectively reasonable subjective belief that the conduct was sufficiently severe and pervasive to alter the terms and conditions of their employment. *Id.* And the environment must be one in which a reasonable person, in a similar situation as the plaintiff, would have perceived as hostile and abusive. *Id.*

Critically, "[w]orkplace conduct is not measured in isolation." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001).  Evidence of harassment should be "considered both cumulatively and in the totality of the circumstances. *Id.* (citing *Mendoza*, 195 F.3d at 1242).  With regard to the objective component, a court should look to "all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).  As this Court has recognized, the objective component is somewhat fact intensive, and the conduct must be considered in context. *Mendoza*, 195 F.3d at 1246.

The district court erred when it found that the conduct at issue was not so frequent as to alter the terms and conditions of Copeland's employment. (Doc. 63 at 13-15.)  However, in arriving at this conclusion, the district court found that there

had only been seventeen (17) instances of harassment between September 2018 and September 2019. (*Id.* at 13 (citing Doc. 46-3 at 113-119).) However, the district court ignored the fact that Copeland testified that his documentation was not meant to be a comprehensive list of all for which he experienced, and Copeland stopped documenting any incidents after Defendant purportedly investigated the incident that occurred with Officer Holland in early September 2019. (Doc. 46-3 at 47:24-49:22.) Had the district court considered more than just being referred to as "ma'am" or "she" by co-workers and the incident with Officer Holland (*see* Doc. 63 at 12), and instead considered the totality of the circumstances, it should have reached a different result.

The evidence, with facts and inferences taken in favor of Copeland,[5] was sufficiently severe and pervasive to alter the terms and conditions of Copeland's employment. While maybe more of an ill-advised decision, as opposed to harassment, this entire situation was the result of Defendant's insistence that Copeland meet with its state-wide HR Director, as well as holding a meeting with most of Copeland's co-workers, before Defendant would agree to update Copeland's personnel file with his *legal name*. Starting a dangerous precedent, Defendant's HR Director failed to address comments from other employees, made in Copeland's presence, concerning their thoughts on what they believed was the appropriate

---

[5] *See Tolan*, 572 U.S. at 651.

21

bathroom to use and what job-related actions he could take as a result of his genitalia.

From the September 2018 meeting, until he took leave in February 2019, several of Copeland's coworkers told him that they refused to refer to him as male because of their personal beliefs. Meanwhile, Copeland had to put up with numerous coworkers, including supervisors, maliciously referring to him as female pronouns, not only on the prison-wide radio while laughing about the comments, but also in front of both new employees and offenders in Defendant's custody. These were not isolated incidents, but something that occurred on a near-daily basis.

During the same time, Copeland had to endure comments being made about his genitalia, including one person who joked that Copeland must have a dildo – a manufactured penis – in his pants. When Copeland tried to address some of this harassment, he was not only criticized for interfering with employees' religious beliefs, but also threatened with disciplinary action for the same. Additionally, Copeland had his own supervisors ask him invasive questions about the purposes of medical appointments, made it difficult for Copeland to get time off, and even issued a written warning when he took off on one day that had been approved.

These incidents, including jokes about Copeland's gender identity, misgendering him in front of all other employees and the offenders, and interference in his medical care, continued on a routine basis when Copeland returned from medical leave in June 2019. Moreover, Copeland had to put up with a supervisor

who was now referring to him as "baby girl" on a routine basis, and another supervisor apparently dug up Copeland's old identification card, prior to his legal name change and transition, and posted it on the wall for everyone else to see. Not only did Copeland observe this occurring well into 2020 (*see* Doc. 58-2 at 3), it was something that Copeland also had to endure when his EAP counselor came to the prison for a meeting.

Critically, one employee went so far, not only to say that she had a religious objection to Copeland, but she referred to him as an "abomination." Officer Holland was the same employee who, on several days in August 2019, threatened to fight Copeland and engaged in conduct that was clearly intended to intimidate Copeland and cause him to anticipate physical violence. Moreover, around the same time, Officer Holland and one other employee actually pushed and slapped Copeland. These coworkers' actions were clearly based on Copeland's gender identity, particularly given that Officer Holland brought it up during the August 23, 2019 incident.

Copeland attempted to both document and report the harassment that he was experiencing in the workplace. However, notwithstanding the internal affairs investigation concerning the threats made by Officer Holland, there is no evidence that Defendant took *any* actions to address Copeland's concerning. Moreover, Copeland was criticized and threatened with disciplinary action on the occasions

where he attempted to use his authority as a supervisor to address his subordinates

comments, and when Copeland tried to get a transfer to another facility, Defendant

thwarted those efforts as well.

The district court was correct in finding that Copeland "subjectively perceived

the conduct at the prison as sufficient enough to alter the terms and conditions of his

employment," evidenced in part by Copeland's complaints filed with HR, his EEOC

Charge, and the pursuit of the instant litigation. (Doc. 63 at 13.) Moreover, this not

only impacted Copeland as a run of the mill employee, but the evidence reflects that

he felt like his authority was being undermined and he was prevented from being an

effective supervisor and leader.

However, the district court's determination that the harassment was not

frequent enough to sustain such a claim was erroneous. The evidence reflects that,

from September 2018 through February 2019, and then from May 2019 when he

returned from leave, until around the time that the EEOC dismissed Copeland's

Charge of Discrimination around the end of March 2020, Copeland had to endure

this treatment almost every single day. Defendant did not only subject Copeland to

this conduct a few dozen times spread out over the course of eleven months. *Cf*

*Guthrie v. Waffle House, Inc.*, 460 F. App'x 803, 807 (11th Cir. 2012). Instead,

Copeland had to put up with this conduct on a daily and near daily basis over the

course of around at least fifteen months, which should have been frequent enough to

sustain a claim for harassment. *See C.H. Robinson Worldwide*, 594 F.3d at 811-12 (finding daily instances of profane gender-based epithets pervasive); *Miller*, 277 F.3d at 1276-77 (finding daily use of ethnic slurs over the course of a month as frequent); *Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417, 418-19 (11th Cir. 1999) (holding that sexually explicit stories and jokes, comments about a female employees body, and sexual advances and touching that occurred "almost-daily" sufficiently severe or pervasive to sustain a harassment claim).

Even if such harassment were not severe, a reasonable juror could have considered some of the conduct sufficiently pervasive to sustain a claim for hostile work environment. Indeed, Title VII does not prohibit the genuine but innocuous differences in the way that individuals interact with members of the same and opposite sex, and "simple teasing, … offhand comments, and isolated incidents" may not amount to actionable harassment. *See Faragher*, 524 U.S. at 788 (citations omitted).

Given that Copeland's coworkers physically threatened him, and actually stuck his person on several occasions, including one time after his coworker called him "an abomination" due to his gender identity, should have been sufficient for Copeland to have established that some of the harassment was physically threatening and humiliating. *See Morgan*, 536 U.S. 101 at 103.  While the district court acknowledged this physical contact, it relied on Defendant's findings after a

supposed investigation to reason that the incident did not rise to the level of physically threatening or humiliating. (Doc. 63 at 16.)  However, even if the internal affairs investigator's findings did not constitute inadmissible hearsay under Federal Rule of Evidence 803, such evidence did not come from a disinterested witnesses and the findings should not have been considered on summary judgment. *Hinson*, 231 F.3d at 827.

Like Copeland, a reasonable person in his position also would have found the physical abuse and threats and other inappropriate comments as hostile and abusive. As noted by the district court (Doc. 63 at 15), "[c]ommon sense, and an appropriate sensitivity to social context, help distinguish between simple teasing and conduct which a reasonable person in plaintiff's position would find severely hostile or abusive." *Barreth v. Reyes 1, Inc.*, No. 15:19-cv-00320-TES, 2020 WL 4370137, at *7 (M.D. Ga. July 29, 2020) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

While most reasonable people may not understand what it feels like to identify as transgender, such a sensitivity to social context should have helped bolster Copeland's claim. For example, Copeland explained as a part of his transition and identifying openly as male, he had to undergo a medical transition that included hormone replacement therapy and he had undergone medical other procedures, and he went through the process of legally changing his name. (Doc. 46-3 at  27:12-

32:14.) It was only after going through those steps that Copeland felt comfortable going to HR to attempt to change his name, and after being given additional requirements in order to change his information in the system, Copeland met those requirements as well.  (*Id.*) Still, it was HR that decided to disclose information concerning Copeland's transition to his coworkers. (*Id.*)  Copeland went to great lengths to have others, including those in his workplace, to consider him as the gender for which he identifies, all to have that undone throughout his employment by his subordinates and supervisors alike.

Even if Copeland's allegations in this case were limited to being misgendered by coworkers on merely a few occasions, both the EEOC and at least one other district court suggest that this may be enough to sustain a hostile work environment claim  by a transgender employee.  In one case, the EEOC considered whether a transgender employee who was restricted from using the bathroom for the gender for which she identified, and was subjected to a supervisor referring to her as male and making other hostile remarks.  *Lusardi v. McHugh*, EEOC Dec. No. 0120133395, 2015 WL 1607756 (2015). As the EEOC reasoned, "supervisors and coworkers should use the name and gender pronoun that corresponds to the gender identity with which the employee identifies in employee records and in communications with and about the employee."  *Id.*, at *11 (citing *Jameson v. U.S. Postal Serv.*, EEOC Dec. No. 0120130992, 2013 WL 2368729 (2013)); *see also*

*Roberts v. Clark Cnty. Sch. Dist.*, 215 F. Supp. 3d 1001, 1015-16 (D. Nev. 2016) (accepting the EEOC's reasoning in *Lusardi* to find that banning a transgender school police officer from the male bathroom was an improper adverse employment action under Title VII).  Moreover, the EEOC found that the continued, intentional misuse of an employee's name and pronouns may undermine such employee's treatment during a gender transition, which is contrary to the idea of treating transgender employees with dignity and respect, and it could also breach the employee's privacy and create a risk of harm to the employee.  *Lusardi*, 2015 WL 1607756, at *11 (citation omitted). In finding that these allegations constituted actionable harassment, the EEOC added that the supervisor's "repeated and intentional conduct was offensive and demeaning to [the employee] and would have been so to a reasonable person in [the employee's] position. *Id.*,

Similarly, a reasonable person who identifies as cis-gender, or not transgender, could have agreed with Copeland that the harassment at issue was objectionable and sufficiently hostile and abusive to alter the terms, privileges, and conditions of their employment, especially when considered all together. For example, a reasonable, cis-gender person would likely find it objectionable if they were required to meet with Defendant's state-wide director and participate in a meeting in which their gender identity is not only disclosed but openly discussed before their employer would make changes to their personnel file reflecting their

legal name.  A reasonable, cis-gender person would also likely be offended if other employees discussed their genitalia and opined on the appropriate restroom they should use. The same person would likely find it hostile an abusive if a colleague stubbornly refused to refer to a person by their preferred pronouns, citing personal or religious beliefs, especially when it occurs on a daily basis over a radio for which everyone could hear.  Any reasonable employee would be offended if a coworker said that it looks like the person had a dildo in their pants, and both male and female employees, alike, would find a supervisor referring to them as "baby girl" as abusive. Similarly, a person would not have to identify as transgender to take issue with a colleague referring to them as "an abomination" or threatening the person with physical violence.

In all, Copeland met his burden at this stage in the proceeding of showing that the conduct for which he was subjected was both subjectively and objectively sufficiently severe and pervasive to alter the terms and conditions of his employment, especially in light of the legal standards.

3) <u>Defendant is liable for the hostile work environment because supervisors were responsible for some of the conduct and Defendant failed to adequately address Copeland's complaints.</u>

Had the district court considered the fifth factor of a harassment claim (*see* Doc. 63 at 17), it would have found that Copeland established that Defendant was liable for the conduct.  When an employee alleges that a co-worker, as opposed to a

supervisor, was responsible for the harassment, a negligence standard applies where the plaintiff must show "that the employer knew or should have known of the offensive conduct but failed to take appropriate action." *Vance v. Ball State Univ.*, 570 U.S. 421, 454 (2013) (Ginsburg, J., dissenting) (citing *Faragher*, 524 U.S. at 799; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); 29 C.F.R. § 1604.11(d); EEOC Guidance 405:7652).

"[A]n employer may be vicariously liable for actionable hostile environment discrimination caused by a supervisor with immediate (or successively higher) authority over the employee – subject to an affirmative defense." *Mendoza*, 195 F.3d at 1245, n. 4 (citing *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. 742). "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765.

While the record was filled with examples of Copeland's reports and complaints to Defendant, beginning around the time that the harassment first commenced, the record was almost entirely devoid of remedial actions taken by Defendant. Indeed, Defendant purported to investigate the incident with Officer Holland, but it did not take any further action on Copeland's complaint. And when

Copeland spoke to his supervisor about what his coworkers had been doing, the only response to this report was that he was permitted to address his shift about his concerns. Accordingly, Defendant was aware of the harassment for which Copeland was subjected by colleagues and subordinates, yet Defendant effectively took no action. Defendant would also be vicariously liable for the conduct of Copeland's supervisors. As with the co-worker harassment, Defendant was on notice of the conduct of Copeland's supervisors, but Defendant is entirely unable to show that it took reasonable care to prevent or correct the harassment, or that Copeland unreasonably failed to take advantage of and preventive or corrective opportunities.

The evidence presented by Copeland showed that he was subjected to unwelcomed harassment that was based on his sex and gender identity, that the conduct at issue was, both objectively and subjectively, severe and pervasive to alter the terms or conditions of Copeland's employment, and that the circumstances suggest that Defendant is liable for the harassment under both legal theories. As a result, and especially if Copeland's evidence had been believed and inferences drawn in his favor, a reasonable juror could have found for Copeland on his hostile work environment claim, and summary judgment should have been denied.

**B.    It Was Erroneous to Grant Summary Judgment Without Considering all the Alleged Acts of Retaliation, and Copeland Met His Burden on his Failure to Promote Claims.**

Copeland established his retaliation claim by showing that he was subjected

to several tangible employment actions as a result of his participation in protected activities. "Title VII … prohibit[s] employers from taking adverse actions against employees in retaliation for their opposition to statutorily prohibited … discrimination. *Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226, 229 (11th Cir. 2011) (citing 42 U.S.C. § 2000e-3(a)). To establish such retaliation, a plaintiff must ultimately prove: "(1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action." *Id.* (citing *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1212-13 (11th Cir. 2008)).

As addressed in the previous section, an employer's mistreatment of an employee based on a protected *characteristic*, such as sex, "is actionable even if the mistreatment does not rise to the level of a tangible employment action, but only if the mistreatment is 'sufficiently severe or pervasive' that it can be said to alter the terms, conditions, or privileges of employment." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020) (quoting *Miller*, 277 F.3d at 1275). However, "mistreatment based on retaliation for protected conduct … is actionable whether or not the mistreatment rises to the level of a tangible employment action, but only if the mistreatment 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). As this Court recently noted, "*Burlington*

*Northern* recognized that this retaliation standard protects employees more broadly – and is more easily satisfied – than the standard applicable to claims of discrimination." *Id.* (citing *Burlington N.*, 548 U.S. at 67).

The district court erred in granting summary judgment on Copeland's retaliation claims primarily because it failed to consider all of the mistreatment that Copeland had claimed had been retaliatory. In Count II of the Complaint, Copeland claimed that Defendant failed to promote him to the rank of lieutenant for discriminatory reasons – because of his gender identity. (Doc. 1, ¶¶ 79-89.) In Count III, Copeland alleged that, after he reported harassment and discrimination to Defendant, he experienced retaliation in the form of "increased harassment, hostile work environment, subjecting [him] to discipline and threatened discipline, and failure to consider [him] for promotion." (*Id.*, ¶¶ 90-96.)

While the district court apparently recognized what Copeland was claiming as retaliation (*see* Doc. 63 at 17), its Order only addressed the retaliatory or discriminatory failure to promote. (*Id.* at 17-21.) The "'well might have dissuaded' standard is contextual." *Monaghan*, 955 F.3d 862 (citing *Burlington N.*, 548 U.S. at 69). In the context of this case, the district court should have found that Copeland met his burden on summary judgment of showing that the increased harassment and disciplinary actions threatened and actually taken against Copeland met such standard. However, the district court erred in failing to do so.

While the district court did not hold that the failure to promote Copeland to lieutenant did not meet the "well might have dissuaded" standard, it also dismissed both the discriminatory and retaliatory failure to promote claims due to a lack of causation. (*See* Doc. 62 at 19-21.)  As the district court noted, "[t]he causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and negative employment action are not completely unrelated." (*Id.* at 19 (citing *Williams*, 411 F. App'x at 229).)  Indeed, during his deposition, Copeland testified that he was not sure who made the hiring decisions for Defendant, or whether such individuals had been aware of his complaints.  (*See id*. at 20.) The district court concluded that, as a result of this testimony, the evidence was insufficient to establish the decisionmakers were aware of the protected activity, citing a recent decision of this Court. (*Id.* (citing *Cid v. City of Miramar*, 810 F. App'x 816, 822 (11th Cir. 2020).

In that case, there was no evidence that the person who made the decision to terminate, a city's chief operating officer, knew that the plaintiff had complained to human resources about national origin discrimination. *Cid*, 810 F. App'x at 822. The evidence further reflected that, while the plaintiff told the decisionmaker that she spoke to human resources, she did not say she had reported that discrimination. *Id.* There was evidence that the decisionmaker spoke to human resources before the termination, but there was testimony from both individuals that human resources did

not tell the decisionmaker about the plaintiff's discrimination complaint. *Id.* Indeed, that may not have been enough for a reasonable factfinder to conclude that the decisionmaker knew of the protected activities. *Id.*

However, the circumstances of this case are entirely different.  Here, a representative of Defendant's HR department got the state-wide HR Director involved immediately after Copeland inquired into making changes to his personnel file to reflect his name change.  HR Director Thomas was not just aware of the situation, she actually visited the Reidville, Georgia prison for a meeting.  When Copeland later followed up with the HR department specifically about the harassment he was experiencing, it would be a reasonable assumption that the HR Director also became aware of the complaint as late as June 2019.  As a result of Copeland's complaints to Defendant's EAP program and the internal affairs investigation concerning Officer Holland, it would also be reasonable to believe that the respective offices were aware.  Copeland made several complaints to his supervisors at his facility, including to his new supervisor in February 2019, as well as several other reports in summer 2019.

However, it is the following that is most critical to this analysis: 1) when Copeland followed up with HR in June 2019, he was told that the Warden would be made aware of his complaints, and Copeland actually met with the Warden soon thereafter; 2) even if management had not been made aware of the internal affairs

investigation concerning Officer Holland in August 2019, Copeland immediately advised his captain, the Deputy Warden of Security, and the Warden about the events that had just taken place; 3) in mid-June 2019, Copeland explicitly and directly opposed comments from the facility's *recruiting supervisor* that Copeland felt were discriminatory; and, 4) Defendant, as a whole, was aware of Copeland's Charge of Discrimination given that it participated in the administrative proceedings before the EEOC (*see* Doc. 1, ¶¶ 61-64).

Critically, Defendant only promoted Copeland to lieutenant within merely a few days after the EEOC dismissed his Charge, and only after the aforementioned recruiting lieutenant had been transferred to another facility.  These facts should have created a causal connection that could have been inferred by the extremely close temporal proximity between the internal complaints, the EEOC Charge, and Defendant's failure to promote. *See Williams*, 411 F. App'x at 229.  Unlike *Cid*, this evidence when viewed together, and especially with inferences viewed in Copeland's favor, should have been sufficient for a reasonable juror to conclude that the individual who decided to reject Copeland's applications for promotion were aware of his internal complaints and opposition to harassment and his September 2019 Charge filed with the EEOC. *Cf. Cid*, 810 F. App'x at 822.

Accordingly, the district court erred in granting summary judgment on Copeland's retaliation claims by failing to address the retaliation alleged in the form

of increased harassment and disciplinary action.   Moreover, based on the totality of the circumstances, and viewed in Copeland's favor, a reasonable juror could have easily found a causal connection between Copeland's participation in protected activities and the unexplained delay in promoting him to the rank of lieutenant. As a result, the district court further erred in granting summary judgment in favor of Defendant on the discriminatory and retaliatory failure to promote claims. That is especially true given that the retaliation standard is supposed to be more easily satisfied, and because with regard to the causal link element, Copeland was only required to show that his protected activities and the negative employment actions were not completely unrelated. *See Burlington N.*, 548 U.S. at 67; *Williams*, 411 F. App'x at 229.

### C.    Copeland Should Have Been Permitted to a Trial by Jury, Both in Light of the Applicable Standard and the Seventh Amendment.

Notwithstanding that the legal standards on summary judgment, Copeland should have been permitted to present his claims to a jury.  "The founders of our Nation considered the right of a trial by jury in civil cases an important bulwark against tyranny and corruption, a safeguard too precious to be left to the whim of the sovereign, or, it might be added, to that of the judiciary." *Parklane Hosier Co., Inc. v. Shore*, 439 U.S. 322, 343 (1979) (Rehnquist, J., dissenting). As Thomas Jefferson wrote in the Declaration of Independence, the lack of jury trials is one of the gravest injuries against free people, "having in direct object the establishment of an absolute

37

Tyranny over [the] States." The Declaration of Independence para. 2 (U.S. 1776); *see also* Brandon L. Boxer, *Judicial Gatekeeping and the Seventh Amendment: How Daubert Infringes on the Constitutional Right to A Civil Jury Trial*, 14 Rich. J.L. & Pub. Int. 479, 481 (2011) ("early American history [records] are filled with references to juries serving as 'anchors' in society that prevent the State from straying too far from principles of republican governance").

However, in the years between 1979 and 2006, the success rate for plaintiffs in federal employment discrimination cases was only 15% compared to a 51% success that plaintiff saw in other cases. Kevin M. Clermont & Stewart J. Schwab, *Employment Discrimination Plaintiffs in Federal Court: From Bad to Worse?*, 3 Harv. L. & Pol'y Rev. 103, 127 (2009). As Professor Ann McGinley notes, "the gap in success between employment discrimination plaintiffs and defendants raises serious questions about procedural and substantive fairness, and the proper role of judges and juries." Ann McGinley, *Cognitive Illiberalism, Summary Judgment, and Title VII: An Examination of Ricci v. Destefano*, 57 N.Y.L. Sch. L. Rev. 865, 868 (2013).

Virtually every circuit has expressed the view that summary judgment is disfavored in employment discrimination cases, warning lower courts to exercise caution because discrimination claims necessarily involve credibility determinations regarding intent and motive, which only a jury can make. Copeland acknowledges

that this Court ruled in *Chapman v. AI Transp*., 229 F.3d 1012, 1025-26 (11th Cir. 2000), that summary judgment is applicable to employment discrimination claims, just as all other civil claims; however, prior to that decision, this Court previously questioned the examination of motive and intent at summary judgment. *See Batey v. Stone*, 24 F.3d 1330, 1336 (11th Cir. 1994) (granting summary judgment which necessarily involves examining motive and intent is especially questionable). Many other Circuits have found the same.[6]

Despite the admonitions to dismiss employment discrimination rarely and sparingly, it is instead routine. *See* Craig M. Reiser, *The Unconstitutional*

---

[6] *See e.g.*, *Straughn v. Delta Air Lines, Inc*., 250 F.3d 23, 34 (1st Cir. 2001)(noting the court "must exercise particular caution before sustaining summary judgments for employers on such issues as pretext, motive, and intent"); *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001)("an extra measure of caution is merited in affirming summary judgment in a discrimination action"); *Ballinger v. North Carolina Agric. Extension Serv*., 815 F.2d 1001, 1004 (4th Cir. 1987)(stating stated that summary judgment is "seldom appropriate" in discrimination cases); *Waltman v. Int'l Paper Co*., 875 F.2d 468, 482 (5th Cir. 1989)(noting summary judgments "are particularly questionable in cases of employment discrimination"); *Webb v. Clyde L. Choate Mental Health and Dev. Ctr.*, 230 F.3d 991, 997 (7th Cir. 2000)(applying "this standard with added rigor in employment discrimination cases, where intent and credibility are crucial issues"); *Luciano v. Montfort, Inc*., 259 F.3d 906, 908 (8th Cir. 2001)(summary judgment should be used sparingly in employment discrimination cases); *O'Shea v. Yellow Technology Services, Inc*., 185 F.3d 1093,1098 (10th Cir. 1999)(summary judgment should seldom be used in employment discrimination cases"); *Von Drasek v. Burwell*, 121 F. Supp. 3d 143, 152-53 (D.D.C. 2015)(the Court must proceed with caution, and must apply a slightly 'heightened standard' that reflects this hesitation"); *cf. Montesano v. Westgate Nursing Home, Inc*., 956 F. Supp. 2d 417, 421 (W.D.N.Y. 2013)(noting that plaintiffs' motions for summary judgment should rarely succeed in discrimination suits where the defendants' knowledge and intent are at issue).

*Application of Summary Judgment in Factually Intensive Inquiries*, 12 U. PA. J. CONST. L. 195, 219 (2009)(noting that "summary judgment has the capacity to be granted inappropriately, thereby violating the Seventh Amendment").

Recognizing this increase in dismissals, the Seventh Circuit recently attempted to correct these errors in *Ortiz v. Werner Enters., Inc*., 834 F.3d 760, 765 (7th Cir. 2016), by casting doubt on the "convincing mosaic" paradigm and the *McDonnell Douglas* framework as "rat's nest of surplus tests," and directing lower courts to examine the totality of the evidence to see if it would "permit a reasonable factfinder" to return a verdict in the plaintiff's favor. Moreover, such warnings are important in this era of imposing doctrines that necessarily require a credibility determination by a jury in dismissing plaintiff's cases – namely, the "good faith (even if mistaken) belief" and "business judgment rule" doctrines. *See, e.g.*, Sandra F. Sperino and Suja A. Thomas, *Unequal: How America's Courts Undermine Discrimination Law*, Chapter 4 (2017).

However, there are several studies and sets of data, including one from the Federal Judicial Center, that show that the Southern District of Georgia is among the highest dismissal rates. *See, e.g.*, FJC Memorandum at 9-10 (revised June 15, 2007) (finding this Circuit had 75% dismissal rate and the highest district in the Eleventh Circuit dismissed 95% of the cases, the highest percentage in the country), available at: https://www.fjc.gov/sites/default/files/2012/sujufy06.pdf (last visited Dec. 7,

2022).   Moreover, according to Westlaw's Litigation Analytics, in the period between January 1, 2010 and the present date, there were 239 motions for summary judgment filed in employment discrimination cases (NOS Codes 442 and 445).  The district court granted 147 of those motions and 38 were granted in part, resulting in a total of 77% of employment discrimination being partially- or fully-disposed on summary judgment.

The Supreme Court has cautioned against "denigrat[ing] the role of the jury." *Anderson*, 477 U.S. at 255. And as almost all of our circuit courts have opined, a deprivation of a plaintiff's constitutional rights to a jury trial by a federal rule of civil procedure is to be sparingly applied. These dismissals are not an example of this system working, but of a deprivation of plaintiffs' constitutional right to a trial by jury. Our founding fathers declared independence to be free from one person making determinations about people's rights, and fought for a free country where a jury of our peers made these decisions. Summary judgment, particularly as applied to this case, and generally within the Southern District of Georgia, is a violation of the fundamental foundation of this country. Allowing one person to determine what facts to rely on, and what the weight of evidence should be, is for the province of the jury.

The right to confront, cross-examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the Seventh Amendment. *See*

41

*Adickes v. S. H. Kress & Co*., 398 U.S. 144, 176 (1970) (Black, J., concurring). Moreover, "[i]t is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'" *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962). Allowing for disposition of an employment discrimination case, based primarily on evidence and affidavits produced by a defendant-employer from its own employees, and without the right to confront, cross-examine, or impeach witnesses at the time of the introduction of their testimony, could not be what the Founding Fathers intended. And that is particularly true given Copeland's constitutional right to a trial by jury.

## CONCLUSION

Accordingly for the above and foregoing reasons, the district court erred by finding facts in favor of Defendant and failing to utilize the correct legal standard in analyzing harassment and retaliation claims, and this Court should reverse such decision and remand this matter for further proceedings.

[*Signature Page Follows*]

Respectfully submitted, this 7ᵗʰ day of December, 2022.

KENNETH E. BARTON III
Georgia Bar No. 301171
*Counsel for Plaintiff-Appellant*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.    This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the word limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

☑ this document contains 10,332 words, or

☐ this brief uses a monospaced typeface and contains _____ lines of text.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

☑ this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 356 in Times New Roman 14 point font, or

☐ this document has been prepared in a monospaced typeface using Microsoft Word for Microsoft 356 with _____.

This 7th day of December, 2022.

_____
KENNETH E. BARTON III
*Counsel for Plaintiff-Appellant*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com

## **CERTIFICATE OF SERVICE**

This is to certify that I have this day served the foregoing BRIEF OF APPELLANT to the Clerk of Court using the CM/ECF system, which will automatically send electronic mail notification of such filing to the following counsel of record, who are CM/ECF participants:

G. Todd Carter, Esq.
Brown, Readdick, Bumgartner,
Carter, Strickland & Watkins, LLP
P.O. Box 220
Brunswick, Georgia 31521-0220
TCarter@brbcsw.com
*Counsel for Defendant-Appellee*

This 7th day of December, 2022.

_____
KENNETH E. BARTON III
Georgia Bar No. 301171
*Counsel for Plaintiff-Appellant*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com