No. 22-13073

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

TYLER M. COPELAND,

Plaintiff-Appellant

v.

GEORGIA DEPARTMENT OF CORRECTIONS,

Defendant-Appellee

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA

_____

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING PLAINTIFF-APPELLANT AND URGING
REVERSAL ON THE ISSUE ADDRESSED HEREIN

_____

KRISTEN CLARKE
 Assistant Attorney General

TOVAH R. CALDERON
JASON LEE
 Attorneys
 U.S. Department of Justice
 Civil Rights Division
 Appellate Section
 Ben Franklin Station
 P.O. Box 14403
 Washington, D.C.  20044-4403
 (202) 598-1317

*Tyler M. Copeland* v. *Georgia Dep't of Corr.*, No. 22-13073

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In accordance with Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, the United States as amicus curiae certifies that, in addition to those identified in the brief filed by plaintiff-appellant, the following persons may have an interest in the outcome of this case:

1. Calderon, Tovah R., U.S. Department of Justice, Civil Rights Division, counsel for the United States;

2. Clarke, Kristen, U.S. Department of Justice, Civil Rights Division, counsel for the United States;

3. Lee, Jason, U.S. Department of Justice, Civil Rights Division, counsel for the United States.

The United States certifies that no publicly traded company or corporation has an interest in the outcome of this appeal.

s/ Jason Lee
JASON LEE
 Attorney

Date:  December 8, 2022

## TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ...........................................C-1

INTEREST OF THE UNITED STATES .................................................................1

STATEMENT OF THE ISSUE.................................................................................2

STATEMENT OF THE CASE...................................................................................3

      1.    *Statutory Background*...........................................................................3

      2.    *Factual Background* .............................................................................4

      3.    *Procedural History*..............................................................................8

SUMMARY OF ARGUMENT .............................................................................10

ARGUMENT

      THE DISTRICT COURT ERRED IN GRANTING
      GDOC'S MOTION FOR SUMMARY JUDGMENT
      ON COPELAND'S HOSTILE-WORK-ENVIRONMENT
      CLAIM ............................................................................................ 12

           A.    *The Misgendering And Other Harassment Copeland*
                *Experienced Was Severe* ...........................................................13

           B.    *The Misgendering And Other Harassment Interfered*
                *With Copeland's Ability To Do His Job* ...................................19

           C.    *The Misgendering And Other Harassment Was*
                *Humiliating And Physically Threatening* ................................21

                1.    *Copeland Was Humiliated By Supervisors' And*
                        *Subordinate Officers' Persistent Use Of The Word*
                        *"Ma'am" Over The Prison Radio* ..................................21

**TABLE OF CONTENTS (continued):**                                        **PAGE**

2.     *Copeland Suffered Multiple Instances Of Physically Threatening Harassment*..............................23

D.     *The Misgendering And Other Harassment Was Frequent* .....................................................................24

1.     *The Evidence Shows That Copeland Suffered Constant Misgendering And Harassment By Officers* .......................................................24

2.     *The District Court Erred In Concluding That This Evidence Was Insufficient To Demonstrate That Copeland Frequently Suffered Misgendering And Other Harassment* ..................................................25

CONCLUSION ........................................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF CITATIONS

**CASES:**                                             **PAGE**

*Allen* v. *Ambu-Stat, LLC*, 799 F. App'x 703 (11th Cir. 2020) ...............................26

*Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...........................................12

*Bostock* v. *Clayton Cnty.*, 140 S. Ct. 1731 (2020).....................................................3

*Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742 (1998) ..........................................17

*Colleen M.* v. *Vilsack*, No. 0120130552,
    2016 WL 3136373 (EEOC May 25, 2016) ...................................................15

*Conner* v. *Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179 (4th Cir. 2000)...............22

*Dawson* v. *County of Westchester*, 373 F.3d 265 (2d Cir. 2004) ...........................19

*Doe* v. *Arizona*, No. 18-cv-384,
    2019 WL 2929953 (D. Ariz. July 8, 2019)............................................ 14, 18

*Doe* v. *Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115 (E.D. Pa. 2020)...............14

*Durham* v. *Rural/Metro Corp.*, 955 F.3d 1279 (11th Cir. 2020)..................... 13, 28

*EEOC* v. *Boh Bros. Constr. Co.*, 731 F.3d 444 (5th Cir. 2013) (en banc).............14

*EEOC* v. *Fairbrook Med. Clinic*, 609 F.3d 320 (4th Cir. 2010) ............................15

*Eller* v. *Prince George's Cnty. Pub. Schs.*,
    580 F. Supp. 3d 154 (D. Md. 2022)...............................................................14

*Ellis* v. *Houston*, 742 F.3d 307 (8th Cir. 2014) .....................................................17

*Faragher* v. *City of Boca Raton*, 524 U.S. 775 (1998)...................................... 28-29

*\*Fernandez* v. *Trees, Inc.*, 961 F.3d 1148 (11th Cir. 2020) ........................... *passim*

*Glenn* v. *Brumby*, 663 F.3d 1312 (11th Cir. 2011)....................................................3

**CASES (continued):**                                                          **PAGE**

*Grimes* v. *County of Cook*, No. 19-cv-6091,
  2022 WL 1641887 (N.D. Ill. May 24, 2022)......................................... 14, 18

*Howley* v. *Town of Stratford*, 217 F.3d 141 (2d Cir. 2000)....................................20

*Hulsey* v. *Pride Rests., LLC*, 367 F.3d 1238 (11th Cir. 2004)................................17

*Jameson* v. *Donahoe*, No. 0120130992,
  2013 WL 2368729 (EEOC May 21, 2013) ...................................................15

*Jemmott* v. *Coughlin*, 85 F.3d 61 (2d Cir. 1996).....................................................18

*Lusardi* v. *McHugh*, No. 0120133395,
  2015 WL 1607756 (EEOC Apr. 1, 2015)......................................... 15-16, 19

*Membreno* v. *Atlanta Rest. Partners, LLC*,
  517 F. Supp. 3d 425 (D. Md. 2021)....................................................... 14, 18

*Mendoza* v. *Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999) (en banc),
  cert. denied, 529 U.S. 1068 (2000)........................................................... 15-16

*Meritor Sav. Bank, FSB* v. *Vinson*, 477 U.S. 57 (1986) ...........................................3

*Miller* v. *Kenworth of Dothan, Inc.*, 277 F.3d 1269 (11th Cir. 2002) ............. 17, 28

*Nichols* v. *Azteca Rest. Enters., Inc.*, 256 F.3d 864 (9th Cir. 2001).......................14

*Oncale* v. *Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998) ...........................15

*Reeves* v. *C.H. Robinson Worldwide, Inc.*,
  594 F.3d 798 (11th Cir. 2010) (en banc)......................................................13

*Rodgers* v. *Western-Southern Life Ins. Co.*, 12 F.3d 668 (7th Cir. 1993) ...............17

*Roy* v. *Correct Care Sols., LLC*, 914 F.3d 52 (1st Cir. 2019) .................................18

*Smith* v. *Northwest Fin. Acceptance, Inc.*, 129 F.3d 1408 (10th Cir. 1997) ...........22

**STATUTES:**                                                                         **PAGE**

Civil Rights Act of 1964, Title VII
     42 U.S.C. 2000e-2(a) ...................................................................1
     42 U.S.C. 2000e-2(a)(1) ..............................................................3
     42 U.S.C. 2000e-5(a) ...................................................................1
     42 U.S.C. 2000e-5(f)(1) ...............................................................1

**RULE:**

Fed. R. App. P. 29(a) .................................................................2

**MISCELLANEOUS:**

Kevin A. McLemore, *A Minority Stress Perspective on*
    *Transgender Individuals' Experiences with Misgendering*,
    3 Stigma & Health 53 (2016) .......................................................16

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————————

No. 22-13073

TYLER M. COPELAND,

Plaintiff-Appellant

v.

GEORGIA DEPARTMENT OF CORRECTIONS,

Defendant-Appellee

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA

———————————————

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING PLAINTIFF-APPELLANT AND URGING
REVERSAL ON THE ISSUE ADDRESSED HEREIN

———————————————

**INTEREST OF THE UNITED STATES**

The United States has a substantial interest in this appeal, which concerns

the proper application of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

2000e-2(a), to harassment of a transgender corrections officer.  The Attorney

General and the Equal Employment Opportunity Commission (EEOC) share

enforcement authority under Title VII.  See 42 U.S.C. 2000e-5(a) and (f)(1).  And

the United States has filed other amicus briefs addressing the proper interpretation

and application of Title VII, including its protections against a hostile work

environment.  See, *e.g.*, U.S. Br. as Amicus Curiae, *Woods* v. *Cantrell*, 29 F.4th 284 (5th Cir. 2022) (No. 21-30150) (hostile work environment); U.S. Br. as Amicus Curiae, *Harris* v. *Mayor & City of Baltimore*, 429 F. App'x 195 (4th Cir. 2011) (No. 09-1446) (hostile work environment); see also, *e.g.*, U.S. Br. as Amicus Curiae, *Humphrey* v. *Augusta*, No. 22-10612 (11th Cir. filed May 13, 2022) (retaliation); U.S. Br. as Amicus Curiae, *Staple* v. *Broward Cnty. Sch. Bd.*, No. 21-11832 (11th Cir. filed Sept. 20, 2021) (religious discrimination).

The United States files this brief under Federal Rule of Appellate Procedure 29(a).

## STATEMENT OF THE ISSUE

For two years, plaintiff-appellant Tyler Copeland, a transgender man working as a sergeant at a state prison, suffered intentional and repeated misgendering by supervisors and coworkers, as well as other harassing conduct. The United States will address the following question only:

Whether the district court erred in concluding that evidence of such treatment was insufficient, as a matter of law, to show that Copeland suffered an objectively hostile work environment, as required to prove a hostile-work-environment claim under Title VII of the Civil Rights Act.[1]

---

[1]  The United States takes no position on any other issue in this appeal.

# STATEMENT OF THE CASE

*1.    Statutory Background*

Title VII bars an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's  *  *  *  sex." 42 U.S.C. 2000e-2(a)(1).  This prohibition on sex discrimination includes discrimination on the basis of gender identity.  See *Bostock* v. *Clayton Cnty.*, 140 S. Ct. 1731, 1737 (2020); cf. *Glenn* v. *Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) (same principle under the Equal Protection Clause).  Unlawful discrimination can occur when an employee suffers sexual harassment that creates "a hostile or abusive work environment."  *Meritor Sav. Bank, FSB* v. *Vinson*, 477 U.S. 57, 66 (1986).  Proving a hostile-work-environment claim requires a five-part showing:  (1) the employee belongs to a protected group; (2) the employee suffered unwelcome harassment; (3) the harassment was based on the employee's protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment; and (5) the employer is responsible for that environment.  *Fernandez* v. *Trees, Inc.*, 961 F.3d 1148, 1153 (11th Cir. 2020).  To establish the fourth element—harassment that is sufficiently severe or pervasive—the employee must show that his work environment "was both subjectively and objectively hostile."  *Ibid.*

- 4 -

2.     *Factual Background*

Copeland, a transgender man, joined Georgia's Department of Corrections in Fall 2014 as a corrections officer in the Rogers State Prison and was later promoted to sergeant. Doc. 46-3, at 15-16, 27-28.[2]  Copeland initially presented as female and had a different name. Doc. 46-3, at 28-29.  Around September 2018, Copeland met with a human resources manager at the prison, informed her that he was transgender, and provided her with documentation showing that he had changed his legal name to Tyler Copeland. Doc. 46-3, at 29-30, 113.

At the request of the prison's human resources department, Copeland did not tell coworkers that he was transgender or that he had changed his name. Doc. 46-3, at 32.  Instead, the human resources director held a meeting with employees at the prison, informed them that Copeland was transgender, and "instruct[ed] them to address [Copeland] with male pronouns and/or as Sergeant Copeland." Doc. 63, at 2.  Copeland also was told that if he "had any issues with other employees," he should report it to his supervisor and the human resources department. Doc. 46-3, at 113.

Contrary to the instruction given to employees, multiple superior officers used female pronouns and other terms when referring to, and communicating with,

---

[2] "Doc. __, at __" refers to the docket entry and page number of documents filed on the district court's docket.

- 5 -

Copeland.  For example, a captain referred to Copeland "as a female" in front of a lieutenant and two other individuals.  Doc. 46-3, at 98.  And one lieutenant "constantly harass[ed], mis-gender[ed]  *  *  *  and taunt[ed]" Copeland (Doc. 46-3, at 115), calling him "'baby girl' and 'ma'am' through the duration of [his] shift" (Doc. 46-3, at 93).  Another lieutenant addressed Copeland using female pronouns over the prison radio system (Doc. 46-3, at 114)—communications that are transmitted to "the whole [prison]" (Doc. 46-3, at 58).  The lieutenant's actions elicited laughter from other officers, leading Copeland to speak with the lieutenant afterwards and ask that he "not embarrass [Copeland] on the radio like that again." Doc. 46-3, at 114.

Numerous sergeants and subordinate officers also misgendered Copeland, and this often occurred over the prison's radio system, as well.  Doc. 46-3, at 102. At least 19 people called Copeland "ma'am" occasionally or throughout their shifts with him.  Doc. 46-3, at 89-90, 92-94, 96, 98-100; see also Doc. 46-3, at 135-136, 138-139.  Three of those individuals laughed or smiled at Copeland after doing so. Doc. 46-3, at 89-90, 92.  One person who "repeatedly call[ed] [Copeland] 'ma'am' throughout the duration of [his] shift" told Copeland "that she was not going to call [him] 'sir'" because "that wasn't who [he] was."  Doc. 46-3, at 92.  With so many people engaged in this conduct "on a daily basis," Copeland would be misgendered by an average of "three or four" officers working with him, depending on the shift

to which he was assigned and the officers whom he was supervising.  Doc. 46-3, at 102.

One subordinate officer used more dehumanizing language when talking about Copeland.  The officer, whom Copeland supervised and who called him "ma'am" during his shift, also referred to Copeland "as 'it' and 'that'" in "phone conversations with [the] main control operator."  Doc. 46-3, at 89-90.  For example, once when the officer called about an incident report and was told that she could speak to Copeland, the officer responded, "'Oh.  I don't wanna talk to THAT!' and hung up the phone."  Doc. 46-3, at 117.  Another coworker would "laugh with the inmates" about "transgender individuals and their genitalia" during mealtimes.  Doc. 46-3, at 94.

This widespread behavior interfered with Copeland's ability to do his job.  Five coworkers, including one sergeant, undermined Copeland's authority as a supervisor by misgendering him in front of new hires—with two of those coworkers "smil[ing] at [Copeland] after" doing so.  Doc. 46-3, at 43, 134-135, 139.  On at least one instance, this misgendering "confused" new cadets, requiring Copeland to explain afterwards that although the cadets might "hear people refer to [him]" using the word "ma'am," that was "not how [they] should refer to [him]."  Doc. 46-3, at 44.  Additionally, two subordinate employees who regularly called

- 7 -

Copeland "ma'am" would, on occasion, "refuse [to take] instructions from [him]."
Doc. 46-3, at 94; see also Doc. 46-3, at 96.

One coworker, Officer Sheila Holland, engaged in more serious and
threatening behavior.  Once, when Copeland was attempting to enter the jail,
Holland "blocked the doorway" and "verbally threatened [him]" by suggesting that
the two "c[ould] fight."  Doc. 46-3, at 118.  Holland also told Copeland that when
he instructed others not to call him "ma'am," it "offend[ed] [her]" because she was
"proud to be a woman."  Doc. 46-3, at 118.  Three days later, when Copeland was
walking through the jail "to go on break," Holland "pushed" Copeland with her left
palm.  Doc. 46-3, at 118.  Then, while Copeland was on his break, Holland took
the jail's "armed perimeter vehicle," used it to "circle[] the parking lot around
[Copeland's] vehicle multiple times" while "occasionally staring at [him]," and
then "parked behind [him]."  Doc. 46-3, at 95, 118.  Because Holland "was
carrying a pistol," Copeland feared for his "life and safety" and contacted the
warden, the deputy warden of security, and his supervisor while he sat in his
vehicle.  Doc. 46-3, at 118.

As he had been instructed to do, Copeland repeatedly reported the
misgendering and other harassment to the prison's human resources department
and to his supervisors.  See, *e.g.*, Doc. 46-3, at 40, 42-43, 91-92, 114; see also p.
25, *infra*.  However, his reports were largely "overlooked and ignored with no

follow up." Doc. 46-3, at 113. For example, the prison investigated Copeland's complaints about Holland blocking the doorway to the prison and suggesting the two "c[ould] fight" (Doc. 46-3, at 118), as well as when she pushed him (see Doc. 46-5, at 4-5). But the prison's investigator was "dismissive" and even referred to Copeland as "ma'am" during "her initial interview" with him and "on multiple [other] occasions." Doc. 46-3, at 53; see also Doc. 46-3, at 51-53. Prison officials ultimately concluded that "there was no merit to [Copeland's] complaint." Doc. 46-3, at 48.

Copeland's inability to obtain relief through the prison's "internal affairs system" caused him to "los[e] faith in the system." Doc. 46-3, at 48. Consequently, he stopped updating a "timeline of events" that he had been keeping to document "clearcut examples of discrimination" that he had suffered between September 2018 and September 2019. Doc. 46-3, at 79, 104; see also Doc. 46-3, at 113-119.

3.   *Procedural History*

Copeland filed suit in the Southern District of Georgia, claiming, as relevant here, that defendant-appellee Georgia Department of Corrections (GDOC) had subjected him to a hostile work environment, in violation of Title VII. Doc. 1. After discovery closed, GDOC moved for summary judgment. Doc. 46. In its motion, GDOC did not dispute that Copeland suffered sex-based harassment. See

- 9 -

Doc. 66, at 10.  Rather, GDOC argued that Copeland's hostile-work-environment claim failed because he could not show that his work environment had been objectively hostile or that GDOC was responsible for that work environment, even assuming that it was hostile.  Doc. 46-1, at 3-6.

In his opposition, Copeland directed the district court to his "Response to Defendant's Statement of Facts" to rebut GDOC's contention that his work environment had not been objectively hostile.  Doc. 58, at 11.  In that response, Copeland cited multiple pieces of evidence establishing that supervisors and coworkers routinely misgendered and harassed him.  This evidence included Copeland's timeline of events and portions of his deposition testimony discussing specific individuals at the prison who had misgendered him.  Doc. 58-1, at 4, 8-10.

In its summary-judgment ruling, the district court stated at the outset that it would "only review the materials the Parties specifically cite and legal arguments they expressly advance."  Doc. 63, at 7.  It then turned to consider whether Copeland's work environment had been subjectively and objectively hostile.  Doc. 63, at 10-17.  The court concluded that while Copeland "likely subjectively perceived" his coworkers' harassment as hostile, the conduct did not rise to that level when judged from an objective perspective.  Doc. 63, at 13-17.  In reaching this conclusion, the court considered only "17 recorded instances" of harassment that were specifically described in Copeland's timeline of events and did not

address the additional examples of harassment cited in Copeland's response to
GDOC's statement of facts.  Doc. 63, at 13-17.

Based on this limited review, the district court held that Copeland could not
show that his work environment had been objectively hostile.  The court concluded
that coworkers simply had been "rude in their statements" to and about Copeland,
and that such conduct "f[ell] short" of demonstrating severe harassment.  Doc. 63,
at 15-16.  It found "no evidence [that] the harassment interfered with [Copeland's]
work conditions."  Doc. 63, at 16.  It discerned in the record only "two occurrences
[of harassment] that could be perceived as physically threatening" and "no
evidence of any humiliation."  Doc. 63, at 16.  And it concluded that the
harassment Copeland suffered had not been "frequent," as the 17 incidents the
court identified in Copeland's timeline of events occurred "over the course of a
year."  Doc. 63, at 13-15.

The district court thus entered summary judgment in GDOC's favor on
Copeland's hostile-work-environment claim.  Doc. 63, at 17.  Copeland timely
appealed.  Doc. 66.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's summary-judgment ruling on
Copeland's hostile-work-environment claim because a reasonable jury could find,

based on the totality of the circumstances, that Copeland suffered an objectively hostile work environment.

The record evidence shows, first, that the harassment was severe.  Copeland was intentionally and repeatedly misgendered by supervisors and coworkers, which, as courts and the EEOC have recognized, may cause harm to an employee. The severity of this misgendering, as well as that of other harassing conduct Copeland suffered, was compounded by the context in which it occurred.  Far from admonishing employees for engaging in such harassment, supervisors personally participated in it by, for example, misgendering Copeland and using infantilizing terms to refer to him.  All of this behavior could have put Copeland at risk of physical harm, given the correctional setting in which he worked.

Second, the misgendering and other harassment unreasonably interfered with Copeland's ability to do his job by undermining his authority as a supervisor and by implicitly encouraging others, including subordinates, to treat him in a demeaning, disrespectful, and (on at least one occasion) dehumanizing manner. Third, because much of the misgendering occurred over the prison radio system and thus could be heard by all on-duty employees, the harassment subjected Copeland to public humiliation.  In addition, Copeland was physically threatened on multiple occasions by at least one employee, who caused Copeland to "fear" for his "life and safety."  Doc. 46-3, at 118.  Finally, the evidence makes clear that

Copeland was misgendered and harassed frequently, on a "constant" or even "daily" basis.  Doc. 46-3, at 102, 114.

For these reasons, entry of summary judgment in GDOC's favor was inappropriate.  The Court should reverse the district court's ruling on Copeland's hostile-work-environment claim and remand for further proceedings, including for consideration of the sole remaining contested factor:  whether GDOC was responsible for Copeland's hostile work environment.

## ARGUMENT

### THE DISTRICT COURT ERRED IN GRANTING GDOC'S MOTION FOR SUMMARY JUDGMENT ON COPELAND'S HOSTILE-WORK-ENVIRONMENT CLAIM

The district court was wrong to hold that a reasonable jury could not find that Copeland's work environment was objectively hostile.  See *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining that "summary judgment will not lie if  *  *  *  the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  This Court weighs four factors when assessing objective hostility:  the severity of the harassment suffered by the plaintiff, whether the harassment unreasonably interfered with the plaintiff's job performance, whether the harassment was humiliating or physically threatening, and the frequency of the harassment.  *Fernandez* v. *Trees, Inc.*, 961 F.3d 1148, 1153 (11th Cir. 2020).  "[N]o single factor" is necessary to show that a work environment is

objectively hostile, and thus a lack of evidence on any single factor "is not fatal."

*Fernandez*, 961 F.3d at 1155 (citation omitted).  Rather, the factors are considered

"cumulatively and in the totality of the circumstances."  *Id.* at 1153 (quoting

*Reeves* v. *C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (en

banc)).

Construing the evidence in the light most favorable to Copeland, see

*Durham* v. *Rural/Metro Corp.*, 955 F.3d 1279, 1281 (11th Cir. 2020), a reasonable

jury could conclude that all four factors militate in favor of finding that Copeland

suffered an objectively hostile work environment.  Specifically, a jury could find

that the misgendering and other harassment inflicted on Copeland by supervisors

and other coworkers was severe, unreasonably interfered with his ability to

perform his job duties, and both humiliated him and threatened his physical safety.

Though comparatively less important here given the strength of the evidence on

the other three factors, a reasonable jury also could conclude that the misgendering

and other harassment were sufficiently frequent to support such a finding.

A.     *The Misgendering And Other Harassment Copeland Experienced Was*
       *Severe*

The district court erred in concluding that, at most, the evidence showed that

officers were "rude" towards Copeland, and therefore, they did not subject him to

harassment "so severe" that it altered his working conditions.  Doc. 63, at 15-16.

To the contrary, a reasonable jury could find that supervisors' and coworkers'

"constant[]" misgendering of Copeland, as well as their other harassing conduct, was severe enough to create a hostile work environment.  Doc. 63, at 15.

1.  Even in cases not involving transgender employees, courts have long recognized that intentional and repeated misgendering of an employee by supervisors and coworkers can contribute to a hostile work environment.  See, *e.g.*, *EEOC* v. *Boh Bros. Constr. Co.*, 731 F.3d 444, 449, 453, 457, 461 (5th Cir. 2013) (en banc) (deeming the evidence sufficient to find that the plaintiff suffered "sufficiently severe or pervasive" sex-based harassment where he was repeatedly called "princess" by a supervisor who perceived him as "not a manly-enough man"); *Nichols* v. *Azteca Rest. Enters., Inc.*, 256 F.3d 864, 870, 873-874 (9th Cir. 2001) (finding "sufficiently severe" harassment where a supervisor and coworkers called a male employee "she," "her," and a "fucking female whore" because he "did not conform to their gender-based stereotypes").  And as numerous district courts have recognized, this principle applies equally to transgender employees. See, *e.g.*, *Eller* v. *Prince George's Cnty. Pub. Schs.*, 580 F. Supp. 3d 154, 173 (D. Md. 2022); *Grimes* v. *County of Cook*, No. 19-cv-6091, 2022 WL 1641887, at *9 (N.D. Ill. May 24, 2022); *Membreno* v. *Atlanta Rest. Partners, LLC*, 517 F. Supp. 3d 425, 442 (D. Md. 2021); *Doe* v. *Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 129 (E.D. Pa. 2020); *Doe* v. *Arizona*, No. 18-cv-384, 2019 WL 2929953, at *3 (D. Ariz. July 8, 2019).

- 15 -

Given that "the objective severity of harassment" is "judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances," *Mendoza* v. *Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc) (quoting *Oncale* v. *Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)), cert. denied, 529 U.S. 1068 (2000), these decisions reflect courts' general recognition that "'personal gender-based remarks' that single out individuals for ridicule" can be "a[] more severe form[] of harassment." *EEOC* v. *Fairbrook Med. Clinic*, 609 F.3d 320, 328-329 (4th Cir. 2010). Consistent with that recognition, the EEOC has repeatedly advised in its federal-sector decisions that a "[p]ersistent failure" by coworkers to use pronouns that align with a transgender employee's gender identity can create an objectively hostile work environment. *Lusardi* v. *McHugh*, No. 0120133395, 2015 WL 1607756, at *11 (EEOC Apr. 1, 2015); see also *Colleen M.* v. *Vilsack*, No. 0120130552, 2016 WL 3136373, at *6 (EEOC May 25, 2016); *Jameson* v. *Donahoe*, No. 0120130992, 2013 WL 2368729, at *2 (EEOC May 21, 2013). This is because "repeated and intentional" misgendering is "offensive and demeaning" to the employee, communicating that he "[is] unworthy of basic respect and dignity because [he] is a transgender individual." *Lusardi*, 2015 WL 1607756, at *11-12; see also *Jameson*, 2013 WL 2368729, at *2

(explaining that "[i]ntentional[ly]" using incorrect pronouns when referring to a transgender employee "may cause harm to the employee").[3]

Accordingly, the record in this case demonstrates that Copeland experienced severe harassment, as supervisors and coworkers regularly subjected him to demeaning gender-based remarks.  Despite the human resources director's instruction that employees should use male pronouns when referring to Copeland, coworkers routinely used the term "ma'am" when communicating with and about him.  See pp. 4-6, *supra*.  One superior officer went a step further, using the infantilizing phrase "baby girl" when speaking with Copeland.  Doc. 46-3, at 115.  And a subordinate employee used dehumanizing terms like "[i]t" and "[t]hat" (Doc. 46-3, at 113)—words that deny Copeland any gender at all.  Construing this evidence in the light most favorable to Copeland, a reasonable person in his position could find this repeated and intentional conduct to be offensive and demeaning, and thus reflective of an objectively hostile work environment.  See *Mendoza*, 195 F.3d at 1246; see also *Lusardi*, 2015 WL 1607756, at *11.

2.  The context in which this misgendering occurred intensified its severity.  It is highly relevant, for example, that multiple supervisors misgendered Copeland.

---

[3]  Social science research confirms that misgendering can have such injurious effects, including causing transgender individuals "to feel stigmatized" and to suffer negative "affective and social psychological outcomes."  Kevin A. McLemore, *A Minority Stress Perspective on Transgender Individuals' Experiences with Misgendering*, 3 Stigma & Health 53, 54 (2016).

See pp. 4-5, *supra*. As the Supreme Court has explained, a "supervisor's power and authority invests his or her harassing conduct with a particular threatening character" and can make the behavior more serious. *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742, 763 (1998). Accordingly, this and other courts have recognized that harassment by a supervisor will "impact[] the work environment far more severely than similar conduct by coequals." *Ellis* v. *Houston*, 742 F.3d 307, 320 (8th Cir. 2014) (citation and internal quotation marks omitted; alteration in original); see also *Hulsey* v. *Pride Rests., LLC*, 367 F.3d 1238, 1248 (11th Cir. 2004); *Rodgers* v. *Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993). Supervisors' participation in misgendering Copeland, therefore, made the conduct more abusive and made Copeland's work environment more hostile.

This hostility was compounded by superior officers' refusal to address or prevent the harassing behavior, despite Copeland's multiple requests. See pp. 7-8, *supra*; p. 25, *infra*. As this Court has emphasized, "it is 'repeated incidents of verbal harassment that continue despite the employee's objections [that] are indicative of a hostile work environment.'" *Miller* v. *Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (alteration in original; citation omitted). Here, verbal harassment of Copeland "continued unabated," even after Copeland "complain[ed]" about those actions to prison leadership. *Fernandez*, 961 F.3d at 1155. This provides a basis on which "a reasonable jury could conclude that [the]

- 18 -

harassment was sufficiently serious to give rise to a hostile work environment claim." *Ibid.*; see also *Membreno*, 517 F. Supp. 3d at 442; *Doe*, 2019 WL 2929953, at *3.

The fact that all of this occurred in the correctional context also is relevant. Conduct that puts an employee "at risk of serious physical harm * * * is severe for purposes of a hostile work environment claim." *Roy* v. *Correct Care Sols., LLC*, 914 F.3d 52, 64 (1st Cir. 2019). Copeland's supervisors and coworkers engaged in such conduct by regularly revealing Copeland's transgender status through their use of female pronouns and other terms, which could have jeopardized his safety among inmates. As other district courts have recognized when analyzing hostile-work-environment claims brought by transgender correctional employees, cavalier disclosure of Copeland's transgender status by and among coworkers "increased the risk that his status would be disclosed to inmates," thus raising "reasonabl[e] fear[s] [about] his safety." *Doe*, 2019 WL 2929953, at *3 n.5; see also *Grimes*, 2022 WL 1641887, at *8 (noting that a transgender man working in a jail could reasonably "fear for his safety" following nonconsensual disclosure of his transgender status). Indeed, the fact that one of Copeland's coworkers joked about transgender people with inmates (Doc. 46-3, at 94) makes such fears all the more reasonable. Cf. *Jemmott* v. *Coughlin*, 85 F.3d 61, 67 (2d Cir. 1996) (deeming harassment "sufficiently severe" where coworkers

put a correctional officer "in danger of physical harm" by failing to provide him with back-up assistance and "humiliating him in front of prisoners he is required to control").

### B.    The Misgendering And Other Harassment Interfered With Copeland's Ability To Do His Job

For similar reasons, the district court wrongly concluded that there was "no evidence" that supervisors' and coworkers' misgendering impeded Copeland's ability to perform the duties of his job.  Doc. 63, at 16.  Corrections officers "depend upon their co-workers for mutual protection and rely upon them for their own ability to assert authority over others in potentially dangerous situations." *Dawson* v. *County of Westchester*, 373 F.3d 265, 273 (2d Cir. 2004). Consequently, "actions of co-officers and superiors that undermine an officer's * * * capacity to command respect and obtain compliance from co-workers[] [and] subordinates  * * *  assume greater, not lesser, significance" in the hostile-work-environment analysis.  *Ibid.*

Here, officers' misgendering of Copeland undermined his ability to assert authority and command respect.  Copeland's supervisors participated in and perpetuated the misgendering "in the presence of other employees," thus "signaling that such conduct was endorsed by [jail] leadership."  *Lusardi*, 2015 WL 1607756, at *12; see also pp. 4-5, *supra*.  Superior officers and coworkers amplified that message further by misgendering Copeland in front of new recruits and individuals

- 20 -

whom Copeland supervised.  See pp. 4-6, *supra*.  Such behavior implicitly communicated that use of female and other derogatory terms to refer to Copeland was not only sanctioned by those in charge of the jail, but actively encouraged.

As Copeland explained in his timeline of events, the predictable effect of this conduct was to "undermine [Copeland's] authority as an assistant shift supervisor" and "prevent[] [him] from being an effective supervisor and leader." Doc. 46-3, at 113; see also pp. 6-7, *supra*.  Indeed, during his deposition, Copeland identified two subordinate officers who, in addition to misgendering him "throughout the duration of [their] shift" with him, would also, on occasion, "refuse [to take] instructions from [him]."  Doc. 46-3, at 94; see also Doc. 46-3, at 96.  As the Second Circuit has explained, conduct that "foment[s]  *  *  *  gender-based skepticism as to the competence of a commanding officer"—thus "diminishing the respect accorded the officer by subordinates" and "creat[ing] a serious question" about whether others will comply with the commander's orders—can create a hostile work environment.  *Howley* v. *Town of Stratford*, 217 F.3d 141, 154-155 (2d Cir. 2000).  A jury easily could apply this common-sense reasoning and find that, by interfering with Copeland's ability to do his job, supervisors and coworkers subjected him to an objectively hostile work environment.

- 21 -

C.    *The Misgendering And Other Harassment Was Humiliating And Physically Threatening*

1.    *Copeland Was Humiliated By Supervisors' And Subordinate Officers' Persistent Use Of The Word "Ma'am" Over The Prison Radio*

Coworkers also subjected Copeland to harassment that was humiliating and physically threatening.  In finding "no evidence of any humiliation of [Copeland]" (Doc. 63, at 16), the district court overlooked the persistent misgendering that occurred over the prison radio system (Doc. 58-1, at 6, 10).  In his deposition, Copeland recounted how coworkers would call him "ma'am" over the prison radio "[o]n a daily basis."  Doc. 46-3, at 38-39.  And in his timeline of events, Copeland offered a specific example of such conduct when a lieutenant "addressed [him] over the radio with female pronouns," evoking "laugh[ter]" from officers down the hall, and leading Copeland to ask the lieutenant afterwards not to "embarrass [him] on the radio like that again."  Doc. 46-3, at 134.

As Copeland stated, officers' practice of misgendering him over the prison radio caused him "public" and "widespread humiliation" for two reasons.  Doc. 46-3, at 114.  First, communications over the prison radio are transmitted to "all of the employees at the [prison]," meaning that officers across "the whole institution c[ould] hear" when others used female pronouns to address Copeland.  Doc. 46-3, at 38.  Case law from this and other circuits confirms that "the level of humiliation suffered" is "enhance[d]" where, as here, "derogatory comments [are] made in the

- 22 -

presence of co-workers." *Fernandez*, 961 F.3d at 1155; see also *Conner* v. *Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 198 (4th Cir. 2000) (holding that "gender-based," "public ridicule" supported a finding that harassing conduct was humiliating); *Smith* v. *Northwest Fin. Acceptance, Inc.*, 129 F.3d 1408, 1414 (10th Cir. 1997) (concluding that harassing remarks made in a "public setting only increase[s] the humiliation, and, therefore, the severity of the discriminatory conduct").

Second, misgendering over the prison radio was humiliating for Copeland because use of the word "ma'am" was not only disrespectful but also an obvious departure from standard procedure. As Copeland explained in his response to GDOC's statement of facts, officers "normally" refer to supervisors over the prison radio by their "call sign," which "consist[s] of a number and a letter." Doc. 58-1, at 6. Copeland's call sign was "L1B." Doc. 58-1, at 6. However, "[s]ubordinates and other supervisors" would not "refer to [Copeland] by [his] call sign." Doc. 46-3, at 38-39. Instead, some "refer[red] to [him] as 'ma'am' over the radio," while others appended the word "ma'am" to the ends of "their message[s] to [him]." Doc. 46-3, at 38-39. Because there was no "legitimate reason" for officers to deviate from the prison's standard practice of using gender-neutral call signs when referring to Copeland, or to conclude their messages with Copeland by using female terminology (Doc. 58-1, at 6), it likely was obvious to all officers listening

- 23 -

over the prison radio that use of the word "ma'am" instead of, or in addition to, Copeland's call sign constituted an intentional and pointed attempt to humiliate him.

2.    *Copeland Suffered Multiple Instances Of Physically Threatening Harassment*

Copeland also suffered harassment that was physically threatening.  The district court acknowledged one occasion, when Officer Holland—someone who was "proud to be a woman" and told Copeland that she found it "offen[sive]" when he instructed people not to call him "ma'am"—pushed Copeland as the two crossed paths in the jail.  Doc. 46-5, at 12; see also Doc. 63, at 16.  But the court failed to consider two other occasions that involved more threatening conduct by Holland.  In one of those instances, Officer Holland circled Copeland's car while driving the prison's "armed perimeter vehicle," "staring at [him]," and "carrying a pistol," and then proceeded to park behind him.  Doc. 46-3, at 95, 118.  Copeland's response in the moment—to immediately alert the warden, the deputy warden of security, and his supervisor of what Holland was doing because Copeland "fear[ed]" for his "life and safety" (Doc. 46-3, at 118)—reflects the menacing nature of these actions.  And in the other instance, Holland "blocked [a] doorway" as Copeland was attempting to enter the jail and "verbally threatened [him]" by suggesting that the two "c[ould] fight."  Doc. 46-3, at 118.  By construing the

evidence of these incidents in the light most favorable to Copeland, a reasonable jury could find that he suffered physically threatening harassment.

D.    *The Misgendering And Other Harassment Was Frequent*

1.    *The Evidence Shows That Copeland Suffered Constant Misgendering And Harassment By Officers*

The three factors above suffice to show that Copeland's work environment was objectively hostile.  See *Fernandez*, 961 F.3d at 1155 (stating that "no single factor" is necessary (citation omitted)).  Indeed, a jury could reasonably find that Copeland's work environment was objectively hostile based on the severity of the harassment that he suffered, without regard to the frequency with which it occurred.  See pp. 12-13, *supra*.  But a jury also could conclude based on the evidence that coworkers misgendered Copeland frequently enough to support a hostile-work-environment claim.

The summary-judgment record makes clear that Copeland was "constantly" misgendered by supervisors and coworkers.  Doc. 58, at 11.  In his response to GDOC's statement of facts, Copeland identified one supervisor who "routinely and regularly referred to him as 'ma'am' and 'baby girl,'" and another officer who "constantly harassed" him by using "female pronouns" and words like "'it' and 'that.'"  Doc. 58-1, at 9-10.  In his timeline of events, Copeland identified two additional officers who "constantly" harassed and misgendered him.  Doc. 46-3, at 114-115.  And in his deposition testimony, Copeland referenced numerous officers

who misgendered him "throughout the duration of [their] shift" with him.  Doc. 46-3, at 90; see also Doc. 46-3, at 57-58, 92-94, 96, 98-100.

Moreover, evidence of Copeland's efforts to address coworkers' misgendering is consistent with such conduct having occurred on a constant and persistent basis.  Copeland directly discussed "the issues [he] was facing" with officers on his shift.  Doc. 46-3, at 114.  Around the same time, Copeland alerted a supervisor to "the constant harassment that [he] was dealing with."  Doc. 46-3, at 9.  Copeland later spoke with a human resources assistant about his "concerns of harassment in the workplace."  Doc. 46-3, at 115.  And Copeland even met with the warden about coworkers' "dangerous and abusive" conduct and provided "examples [of] what was being said" about him.  Doc. 46-3, at 115.  Copeland also contacted the prison's Employee Assistance Program to try and remedy the "issues in the workplace" he was experiencing.  These reports and the harassment they describe corroborate the "constant[]" harassment that Copeland says he experienced.  Doc. 58, at 11.

> 2.    *The District Court Erred In Concluding That This Evidence Was Insufficient To Demonstrate That Copeland Frequently Suffered Misgendering And Other Harassment*

Frequency was the only factor that the district court discussed in significant detail.  In its discussion, the court acknowledged Copeland's description of coworkers' harassment as having "occur[red] 'constantly'" (Doc. 63, at 15), but it

- 26 -

refused to credit this statement for two reasons.  Neither of those reasons

withstands scrutiny.

First, the district court faulted Copeland for not "provid[ing] evidence [that]

the harassment he received was daily."  Doc. 63, at 14.  Considering only

Copeland's timeline of events and none of the other documents in the summary-

judgment record, the court stated that, despite Copeland's characterization of the

harassment as "constant," he had "enumerated" only "17 recorded instances" of

harassment "spread out over the course of a year."  Doc. 63, at 13, 15.  The court

deemed this "not so frequent as to alter the terms and conditions of [Copeland's]

employment."  Doc. 63, at 15.[4]

These conclusions misconstrue governing case law and the summary-

judgment record.  As this Court recently observed, circuit "case law has never

demanded daily incidents" to establish an objectively hostile work environment.

*Allen* v. *Ambu-Stat, LLC*, 799 F. App'x 703, 709 (11th Cir. 2020).  And this Court

specifically has rejected the proposition that "a plaintiff must recall every specific

instance of discriminatory conduct to establish that the conduct was frequent."

*Fernandez*, 961 F.3d at 1154.  Indeed, where a plaintiff like Copeland attests that,

"on a daily basis," approximately "three or four individuals" on his shift would

---

[4]  The district court did not identify the "17 recorded instances" of
harassment that it found in Copeland's timeline of events.  See Doc. 63, at 13-15.

engage in harassing conduct (here, misgendering) (Doc. 46-3, at 102), such

specificity would be unreasonable to demand and impossible to satisfy.  Moreover,

as Copeland explained in his response to GDOC's statement of facts, the timeline

of events was not meant to be comprehensive.  Doc. 58-1, at 8.  Rather, it simply

catalogued "the most-notable incidents of harassment that occurred."  Doc. 58-1, at

8; see also Doc. 46-3, at 37, 44, 49, 79-80.  Indeed, in his deposition testimony,

Copeland explained that the timeline "left out" the "constant radio traffic" in which

supervisors and subordinates misgendered him.  Doc. 46-3, at 37.  The timeline

thus provided no basis for the district court to reject Copeland's statement that he

suffered "constant[]" misgendering and harassment by coworkers.  Doc. 63, at 15.

Second, the district court cited Copeland's statement that "a lot of people

have accepted [him] and have had good faith effort addressing [him] accordingly."

Doc. 63, at 14 (alterations in original; citation omitted).  But simply because *some*

coworkers used terms and pronouns that accorded with Copeland's gender identity

does not bar a finding that *other* coworkers frequently misgendered and harassed

him.  In fact, as the court recognized, Copeland specifically said that they did.  See

Doc. 63, at 14 (quoting Copeland's statement that "there are still a handful of

individuals who constantly harass [him] at work" (alteration in original)).  By

holding that a reasonable jury could not have found that Copeland suffered

frequent harassment, simply because some, but not all, coworkers treated him

- 28 -

respectfully, the district court failed to construe the evidence in the light most

favorable to Copeland.  See *Durham*, 955 F.3d at 1281.

* * * * *

The district court erred in granting summary judgment in GDOC's favor on

Copeland's hostile-work-environment claim because a reasonable jury could

conclude that all four of the relevant factors weigh in favor of finding that

Copeland's work environment was objectively hostile.  Accordingly, this Court

should reverse the district court's ruling and remand for consideration of the sole

remaining contested factor in the hostile-work-environment analysis:  whether

GDOC was responsible for Copeland's hostile work environment.  See *Fernandez*,

961 F.3d at 1153.  This will depend on whether GDOC may be held vicariously

liable, because the hostile environment was "created by a supervisor with

immediate (or successively higher) authority over [Copeland]," *Faragher* v. *City of*

*Boca Raton*, 524 U.S. 775, 807 (1998); see also *Miller*, 277 F.3d at 1278, or

directly liable, because GDOC "knew or should have known of the harassing

conduct [by Copeland's coworkers] but failed to take prompt remedial action,"

*Miller*, 277 F.3d at 1278.

The United States takes no position on this issue, but observes that GDOC

does not dispute that both forms of liability may apply here.  Doc. 46-1, at 5-6.

Indeed, in the proceedings below, GDOC argued only that it had an affirmative

- 29 -

defense to vicarious liability based on its "exercise[] [of] reasonable care to prevent harassment" and "prompt action to investigate [Copeland's] complaint regarding [Officer] Holland."  Doc. 46-1, at 6.  But GDOC did not argue, as it must to prevail on such an affirmative defense, that Copeland "failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Faragher*, 524 U.S. at 807-808.  On the contrary, the summary-judgment record shows that Copeland repeatedly reported, to no avail, the harassment to the prison's human resources department and to his supervisors, as he had been instructed to do.  See pp. 7-8, *supra*.

# CONCLUSION

For the foregoing reasons, this Court should reverse the district court's summary-judgment ruling on Copeland's hostile-work-environment claim and remand for further proceedings.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Jason Lee
TOVAH R. CALDERON
JASON LEE
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-1317

# CERTIFICATE OF COMPLIANCE

I certify that the attached BRIEF FOR THE UNITED STATES AS AMICUS CURIAE SUPPORTING PLAINTIFF-APPELLANT AND URGING REVERSAL ON THE ISSUE ADDRESSED HEREIN:

(1) complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,309 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and

(2) complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2019, in 14-point Times New Roman font.

s/ Jason Lee
JASON LEE
 Attorney

Date:  December 8, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2022, I electronically filed the foregoing BRIEF FOR THE UNITED STATES AS AMICUS CURIAE SUPPORTING PLAINTIFF-APPELLANT AND URGING REVERSAL ON THE ISSUE ADDRESSED HEREIN with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.  I further certify that four paper copies identical to the electronically filed brief will be mailed to the Clerk of the Court by Federal Express.

s/ Jason Lee
JASON LEE
 Attorney